UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————x
                               :

UNITED STATES OF AMERICA,       :

                               :

        *Plaintiff,*        :     No. 1:21-cv-05578

                               :

        *v.*                  :     Dist. Judge Margo K. Brodie

                               :

JUAN REYES and              :     Mag. Judge Peggy Kuo
CATHERINE REYES,          :

                               :

        *Defendants.*     :
——————————————————————x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF UNITED STATES' MOTION FOR SUMMARY JUDGMENT**

The Plaintiff United States of America, pursuant to Federal Rule of Civil Procedure 56, respectfully requests that the Court enter an order granting summary judgment on all causes of action in this case.

## INTRODUCTION

This is an action by the United States to reduce to judgment liabilities for civil penalties assessed against Defendants Juan Reyes and Catherine Reyes for their willful failure to file a Report of Foreign Bank and Financial Accounts ("FBAR") with respect to their jointly-held foreign bank account during 2010-2012. The United States anticipates that the only real dispute in this case on summary judgment will be whether Defendants' conduct was willful.

As explained below, Defendants' failure to file an FBAR for 2010, 2011, and 2012 was willful because recklessness alone is sufficient to establish willfulness, and the various indicia of recklessness established through the body of caselaw in civil FBAR cases are amply represented here, including but not limited to (1) Defendants' submission of federal income tax returns which falsely state that Defendants had no foreign financial accounts during those tax years, (2)

1

Defendants' failure, according to their own testimony, to make a simple inquiry to their accountant regarding the foreign financial account, including any tax consequences therefrom, (3) Defendants' understanding that interest income from a domestic bank is taxable under U.S. law, (4) Defendants' instructions to the foreign bank where the account was held to hold mail related to the account, and/or to not invest in U.S. securities, and (5) Defendants' foreign account was a significant percentage of their net worth during the years at issue.  In addition, Juan Reyes, having a medical degree and practicing medicine for more than 50 years, is a sophisticated taxpayer, and both Dr. Reyes and Mrs. Reyes are part-owners in real-estate ventures.  They have surrounded themselves with professionals who were in positions to either advise them about the implications of the foreign account, or at the very least point them in right direction, including their long-time CPA and their son, who is a lawyer and a partner at a national law firm. Therefore, the Court should find that the Defendants' failure to file an FBAR for their foreign financial account for years 2010-2012 was willful, and grant summary judgment in the United States' favor.

## BACKGROUND FACTS

### A.      Defendants' Background.

Dr. Juan Reyes is a United States citizen, and he was a United States citizen during calendar years 2010, 2011, and 2012.  Statement of Undisputed Material Facts ("SUF"), ¶ 1.  Dr. Reyes was born in Nicaragua and is a dual citizen of Nicaragua and the United States.  *Id.*  He moved to the United States in 1960.  *Id.*

Catherine Reyes is a United States citizen, and she was a United States citizen during calendar years 2010, 2011, and 2012.  *Id.* ¶ 2.  Mrs. Reyes was born in the United States and is a dual citizen of Ireland and the United States.  *Id.*  Sometimes Mrs. Reyes chooses to spell her

first name Katherine, but her legal name is Catherine. *Id.* Dr. Reyes and Mrs. Reyes have been married to each other for 57 years. *Id.*

In 2010-2012, Dr. Reyes was, and he still is, employed as a doctor in private practice in New York, New York. *Id.* ¶ 3. Dr. Reyes has his own medical practice, which does business through a professional corporation named "Juan D. Reyes, M.D., P.C." that has been solely owned by Dr. Reyes since its inception. *Id.* Dr. Reyes attended college in Leon, Nicaragua. *Id.* In 1957, Dr. Reyes obtained a medical degree from the National University of Mexico in Mexico City, Mexico. *Id.* After moving to the United States, Dr. Reyes attended New American College and New York University so he could pursue additional medical education. *Id.* Upon working at the Veterans Administration in New York, he became proficient in thoracic surgery and general surgery. *Id.*

In 2010-2012, Mrs. Reyes assisted Dr. Reyes with his medical practice; one of her duties included billing insurance companies. Mrs. Reyes still works with Dr. Reyes in this capacity. *Id.* ¶ 4.

The Reyeses, together with their son, Juan Reyes, III, own two LLCs: 91 Avaline LLC and 424 Avaline LLC. *Id.* ¶ 5. With respect to each entity, Dr. Reyes owns 90%, Mrs. Reyes owns 5%, and Juan Reyes, III, owns the remaining 5%. Each of these entities owns one building located in New York City. *Id.* In the building owned by 91 Avaline LLC, the residential spaces are leased out to tenants, and Dr. Reyes uses the commercial space to run his medical practice, primarily serving low-income individuals. *Id.* The building owned by 424 Avaline LLC currently has ongoing renovations, and upon completion of the renovations and obtaining a certificate of occupancy, it is anticipated that the building will be leased to various tenants. *Id.*

3

Dr. Reyes and Mrs. Reyes have three children: Alexander Reyes, who prior to his passing in 2003, worked for JP Morgan Chase Bank, N.A.; Juan Reyes III, an attorney in New York City, where is a partner at a law firm; and Catherine Reyes, a teacher in New York City.  *Id.* ¶ 6.

Neither Dr. Reyes nor Mrs. Reyes ever resided in the United Kingdom, Spain, or Switzerland.  *Id.* ¶ 7.

Aside from the owning the bank account that is at issue in this litigation, neither Dr. Reyes nor Mrs. Reyes ever conducted business in the United Kingdom, Spain, or Switzerland.  *Id.* ¶ 8.

**B.     The Foreign Bank Account.**

In or around 1972, Dr. Reyes's parents opened a bank account in Dr. Reyes's name in Nicaragua at Banco de Londres y America del Sur ("Banco de Londres").  *Id.* ¶ 9.  Dr. Reyes's parents provided the initial funds to start the bank account, which totaled approximately $200,000.  *Id.*  Dr. Reyes's parents passed away in or around 2003.  *Id.*

Banco de Londres became part of Lloyds Bank, and on or about April 19, 1994, a joint account in the name of Dr. Reyes and Mrs. Reyes was established at Lloyds Bank PLC in the United Kingdom.  *Id.* ¶ 10.  Dr. Reyes and Mrs. Reyes's joint account at Lloyds Bank PLC, which was later moved to Lloyds TSB Bank in Switzerland, had an account number ending in 250 ("the Lloyds Account"), also referred to as a Client ID Number.  *Id.*  During 2010-2012, the Lloyds Account was with Lloyds TSB Bank in Switzerland.  *Id.*

The Lloyds Account was comprised of three components: (1) a cash account; (2) money market instruments and money market funds; and (3) securities.  *Id.* ¶ 11.

Dr. Reyes and Mrs. Reyes both had signatory authority over the Lloyds Account from its creation as a joint account in 1994 until it was closed in 2013.  *Id.* ¶ 12.

In or around 2000, Dr. Reyes and Mrs. Reyes met with a Lloyds Bank representative, Mr. Bernard Gaughran, in the United Kingdom to discuss the status of the Lloyds Account, discussing that if the Reyeses needed to withdraw money from the account, they could do so by way of a credit card.  *Id.* ¶ 13.  Dr. Reyes met with Mr. Gaughran on other occasions to discuss the Lloyds Account.  *Id.*  Dr. Reyes would communicate via telephone, fax, or letter with Mr. Gaughran sporadically throughout the time the Lloyds Account was open.  *Id.*

Dr. Reyes and Mrs. Reyes requested that Lloyds Bank keep mail, or retain all account related correspondence, rather than having it sent to them at their designated address in the United States. Glen Decl., Ex. I.  Dr. Reyes and Mrs. Reyes would sporadically receive information about the Lloyds Account only upon their request.  *Id.* ¶ 14.  The Reyeses paid a fee to Lloyds Bank for the hold mail service – for example, they paid $109.47 in September 2012 to Lloyds Bank for a hold mail service.  *Id.*

Dr. Reyes and Mrs. Reyes closed the account at the end of 2013 or early 2014, transferring all of the funds in the account to a J.P. Morgan Chase bank account in the United States.  *Id.* ¶ 15

During 2010, 2011, and 2012, the Lloyds Account represented between 75% and 90% of the Reyes' wealth.  *Id.* ¶ 16.

### C.  Use of the Lloyds Account and Efforts Taken to Conceal the Lloyds Account from the United States.

Dr. Reyes and Mrs. Reyes instructed Lloyds Bank to divest their U.S. securities and to avoid the U.S. income tax withholdings, and Mrs. Reyes signed a form requesting the same.  *Id.* ¶ 17.

In 2010, 2011, and 2012, Dr. Reyes and Mrs. Reyes had credit cards linked to the Lloyds Account to allow them to use funds from the Lloyds Account to sustain their lifestyle in the

United States and abroad, and to help move their family out of Nicaragua. *Id.* ¶ 18. One example is that Mrs. Reyes had a credit card with UBS ending in 7578, and the Reyeses used the Lloyds Account to pay the balance on that UBS credit card. *Id.* Dr. Reyes and Mrs. Reyes also used the Lloyds Account to pay the balance of other credit cards between 2007 and 2012. *Id.* ¶ 19.

During the years at issue in this litigation, Dr. Reyes and Mrs. Reyes used the Lloyds Account to pay domestic expenses, including numerous payments to Wells Fargo and transfers to their JP Morgan Chase bank account in the United States. *Id.* ¶ 20.

The Reyeses shielded the use of the Lloyds Account to pay for their living expenses in the United States in various ways. For example, Mrs. Reyes requested to pick up one credit card, a Maestro Card linked to the Lloyds Account, at a bank location in Madrid, Spain, rather than having it mailed to her home in New York. *Id.* ¶ 21. Additionally, Mrs. Reyes directed her Eurocard statements be sent to a family friend's address in Madrid, rather than her home address in the United States. *Id.* ¶ 22.

### D. Preparation of Federal Income Tax Returns for 2010-2012 by Sidney Yoskowitz.

Sidney Yoskowitz, the Reyeses' trusted accountant, prepared and filed their original 2010-2012 federal income tax returns. *Id.* ¶ 23.

Dr. Reyes and Mrs. Reyes worked with Mr. Yoskowitz for approximately 40 years before Mr. Yoskowitz's retirement. *Id.* ¶ 24. Dr. Reyes believed he received good advice from Mr. Yoskowitz throughout their relationship as a CPA, in which he prepared their tax returns and also gave them tax advice on their LLCs. *Id.*

Mr. Yoskowitz's routine practice during the years he worked for the Reyeses was to send what he referred to as a "client organizer" to his clients every year to assist him in preparing their

6

federal income tax returns.  *Id.* ¶ 25.[1]  Mr. Yoskowitz's custom and practice was to ask his

clients if they had any foreign income.  *Id.*  The Reyeses never returned the client organizer, but

instead they would send Forms 1099 for their income.  *Id.*

During tax return preparation season, Dr. Reyes and Mrs. Reyes compiled documents Dr.

Reyes received from insurance companies for work he did through his medical practice and

Forms 1099 the Reyeses received from banks, where Dr. Reyes and Ms. Reyes held their

domestic bank accounts.  They provided this documentation to Mr. Yoskowitz to prepare their

returns.  *Id.* ¶ 26.

Dr. Reyes and Mrs. Reyes did not disclose the existence of the Lloyds Account to their

longtime tax return preparer, Mr. Yoskowitz, when he prepared their original income tax returns

for the tax years 2010-2012.  *Id.* ¶ 27.  The Reyeses did not provide Mr. Yoskowitz with any

information about the Lloyds Account because, according to Dr. Reyes, it was "not income in the

---

[1] The document referenced in the SUF is a letter from Defendants' accountant, Sidney Yoskowitz, to the IRS dated February 6, 2018, in response to the IRS's document requests during the FBAR examination.  Yoskowitz died before the commencement of this case. Although the contents of Yoskowitz's letter are used for the truth of the matter asserted, the statements contained therein are non-hearsay as being "made by the party's agent…on a matter within the scope of that relationship while it existed."  Federal Rule of Evidence ("FRE") 801(d)(2)(D).  As a general rule, the statement of an accountant made with respect to his employment with a party is considered non-hearsay under FRE 801(d)(2)(C).  *See United States v. Diez*, 515 F.2d 892, 896 n.4 (5th Cir. 1975); *Hayes v. United States*, 407 F.2d 189, 192 (5th Cir. 1969); *United States v. Vito*, 1988 WL 78031, at *2 (E.D. Pa. Jul. 22, 1988) (holding that statements made by taxpayer's accountant and two former attorneys to IRS agents were admissible non-hearsay because the accountant and former attorneys were taxpayer's agents at the time they made the statements to the IRS, and the statements concerned matters within the scope of their agency).  Here, Yoskowitz's letter to the IRS was made while he was still the Defendants' accountant, and concerns matters within the scope of his employment relationship with Defendants.

United States…[Dr. Reyes] didn't feel the obligation that we have to this country with this account." *Id.*

After Mr. Yoskowitz prepared the Reyeses' 2010-2012 income tax returns, Dr. Reyes reviewed the returns for accuracy, and signed and returned them to Mr. Yoskowitz for filing with the IRS. *Id.* ¶ 28.

According to Mrs. Reyes, she did not review the Reyeses' 2010-2012 joint federal income tax returns after they were prepared by Mr. Yoskowitz for accuracy prior to signing. *Id.* ¶ 29. She knew Mr. Yoskowitz prepared the returns and Mrs. Reyes testified, "if Sidney sent it to me, I signed it." *Id.*

Mr. Yoskowitz learned about the Reyeses' foreign income and existence of the Lloyds Account in 2014 when the Reyeses' counsel asked Mr. Yoskowitz to prepare amended federal income tax returns for income tax years 2005-2014. *Id.* ¶ 30.

### E.      Filing Federal Income Tax Returns for 2010-2012 and Failure to Timely File FBARs.

Dr. Reyes and Mrs. Reyes filed joint federal income tax returns for the tax years 2010-2012. *Id.* ¶ 31.

Dr. Reyes and Mrs. Reyes's originally-filed joint federal income tax returns for 2010-2012 failed to disclose the existence of the Lloyds Account. Glen Decl., Ex. O (Income Tax 2010 Return); Ex. P (2011 Income Tax Return); Ex. Q (2012 Income Tax Return).  On the Schedule B of their originally-filed joint federal income tax returns for 2010-2012, Dr. Reyes and Mrs. Reyes checked "no" in response to the question on Schedule B of whether they had an interest in or a signature or other authority over a financial account (including bank accounts, securities account, or other financial account), in a foreign country.  *Id.* ¶ 32.

Dr. Reyes and Mrs. Reyes did not report any income from the Lloyds Account on their originally-filed joint federal income tax returns for the tax years 2010-2012. *Id.* ¶ 33.

Dr. Reyes and Mrs. Reyes failed to timely file an FBAR for the Lloyds Account for each of the calendar years 2010, 2011, and 2012, by June 30 of the following year, when the FBAR was due. *Id.* ¶ 34.

**F.    Dr. Reyes and Mrs. Reyes Did Not Seek Any Advice from Professionals on Tax Implications and Reporting Requirements Regarding the Account.**

According to their testimony, Dr. Reyes and Mrs. Reyes did not consult with any professional advisor, accountant (including Mr. Yoskowitz), or other advisor regarding the U.S. tax implications or reporting requirements for the Lloyds Account, until late 2013, when the Reyeses consulted with an attorney in conjunction with the closing of the Lloyds Account and moving the funds to the United States. *Id.* ¶ 35.

When signing and submitting the originally-filed joint 2010-2012 income tax returns, Dr. Reyes was aware that the United States required its citizens to report certain financial interests they had outside of the United States; however, he stated he did not believe that those requirements applied to the Reyeses with respect to the Lloyds Account.  Dr. Reyes testified during his deposition that he did not report the Lloyds Account because he believed that if you were a citizen of another country, and the money was generated in that country, then the United States did not have jurisdiction over the foreign account. *Id.* ¶ 36.  His belief was based on a newspaper article written by an individual named "Robert Malta Grossman," once published in a Nicaraguan newspaper, and on conversations with individuals he identified as "international lawyers." *Id.*  Specifically, Dr. Reyes said he did not have a requirement to report his financial interests outside of the United States because, "if you have an account outside the country where you are a citizen, that money belongs, it's on the jurisdiction where the money was generated,

and my understanding is that the money was generated in Nicaragua.  It was not in the jurisdiction for the United States." *Id.*  Dr. Reyes further testified that if he brought the money into the United States, then he would have to pay tax on the money, but only at that time and only tax. *Id.*  Despite having a longtime CPA (Mr. Yoskowitz), a son who worked in the banking industry, and another son who practiced as an attorney, Dr. Reyes stated that it never occurred to him, according to his own testimony, to seek out professional advice within the United States to determine reporting requirements for the Lloyds Account.  *Id.*

Dr. Reyes claims that he became aware of the FBAR reporting requirement around late 2013, when he sought to repatriate the funds in the Lloyds Account.  *Id.* ¶ 37.

### G.     Amended Income Tax Returns for 2010-2012.

In 2014, Dr. Reyes and Mrs. Reyes requested Mr. Yoskowitz to prepare and file amended federal income tax returns for income tax years 2010, 2011, and 2012.  *Id.* ¶ 38.

The amended income tax returns for 2010, 2011, and 2012 disclosed the existence of, and interest income from, the Lloyds Account.  *Id.* ¶ 39.

### H.     Entrance Into and Withdrawal From OVDP.

In 2014, Dr. Reyes and Mrs. Reyes requested entry into the Department of Treasury's Offshore Voluntary Disclosure Program ("OVDP") for calendar years 2005-2012.  *Id.* ¶ 40.

The purpose of OVDP during the years at issue (2010-2012) was to bring taxpayers who had previously used undisclosed foreign accounts and assets to avoid or evade taxes into compliance with the United States' tax and related laws.  *Id.* ¶ 41.

On March 4, 2014, as part of OVDP, Dr. Reyes and Mrs. Reyes submitted Offshore Voluntary Disclosures to the IRS, disclosing the existence of the Lloyds Account from 2005 to 2012.  *Id.* ¶ 42.  The Reyeses admitted the account had a balance between $1,000,000 and

$2,500,000 from 2005 to 2012 and estimated the income the account made for those years was between $0 and $100,000. *Id.*

As part of their entrance into OVDP, on or about October 2, 2014, Dr. Reyes and Ms. Reyes filed delinquent FBARs with amended income tax returns for 2010-2012. *Id.* ¶ 43.

Dr. Reyes and Mrs. Reyes withdrew from OVDP in October 2016 because they believed that "the penalties were too high." *Id.* ¶ 44. At his deposition, Dr. Reyes testified that the IRS sought $600,000, and the Lloyds Account balance at the time was around $2 million. *Id.*

## I.      IRS Willful FBAR Penalty Assessment.

The Reyeses consented to extend the time for the IRS to assess civil penalties under 31 U.S.C. § 5321 for FBAR violations. *Id.* ¶ 45.

Upon their withdrawal from OVDP, the IRS thereafter opened an examination to determine Dr. Reyes and Mrs. Reyes's compliance with filing of FBARs for 2010-2012. *Id.* ¶ 46. The IRS determined from its examination that Dr. Reyes and Mrs. Reyes willfully failed to timely report on an FBAR their financial interest in the Lloyds Account by the deadline for calendar years 2010, 2011, and 2012. *Id.* ¶ 47.

In 2010, 2011, and 2012 the highest balances of the Lloyds Account were: $2,161,500 (2010), $2,113,813 (2011), and $2,086,955[2] (2012). *Id.* ¶ 48. In 2010, 2011, and 2012 the Account had the following balances as of June 30, of the following year, respectively: $2,113,813, $2,064,258, and $2,101,330. *Id.* ¶ 49.

---

[2] This high balance for 2012 is from Defendants' late-filed FBAR for that year. However, unlike the high balances for 2010 and 2011, the 2012 high balance per the FBAR does not match the 2012 high balance determined by the IRS per its penalty computation worksheets ($2,113,485). Nevertheless, the difference in 2012 high balance amounts has no effect on the penalty calculation because the IRS calculated the penalties using the June 30, 2012, account balance.

Initially, the IRS Examiner determined that for years 2010-2012 the total willful FBAR penalty pursuant to the statutory maximum under 31 U.S.C. § 5321(a)(5)(C) and (D) for Dr. Reyes was $3,139,701, and the same amount for Mrs. Reyes.  This amount was calculated by multiplying 50% by the account balance on June 30 of the following year, then adding together the resulting amounts for years 2010, 2011, and 2012.  Using her discretion, permissible by the Internal Revenue Manual, the IRS examiner determined that the taxpayers qualified for mitigation.  The IRS examiner decided that appropriate FBAR penalties for 2010-1012 were: $172,022 for 2010, $172,022 for 2011, and $172,021, for 2012, for Dr. Reyes and the same amount for Mrs. Reyes.  These amounts were calculated by multiplying the June 30, 2012, account balance ($2,064,258) by 50%, and then multiplying the resulting amount ($1,032,129) by 50% to account for each spouse's one-half ownership in the account, and then spreading the resulting amount ($516,065) evenly across years 2010-2012.  *Id.* ¶ 50.

After Dr. Reyes and Mrs. Reyes submitted a formal protest and the IRS did an additional review, the IRS ultimately determined that an additional 20% discount would be appropriate.  *Id.* ¶ 51.  Thus, the assessments for FBAR penalties for each of the Reyeses' failure to report the foreign bank account at Lloyds Bank ending in 250 were as follows: $140,017 for 2010, $140,017 for 2011, and $140,017 for 2012, totaling $420,051.  These assessments were made against both Dr. Reyes and Mrs. Reyes.  *Id.*

Dr. Reyes and Mrs. Reyes separately signed an IRS Form 13449, Agreement to Assessment and Collection of Penalties under 31 U.S.C. 5321(a)(5) and 5321(a)(6), on October 9, 2019, in which they each consented to the immediate assessment and collection of FBAR penalties totaling $420,051.  *Id.* ¶ 52.  On October 11, 2019, the IRS assessed civil FBAR penalties in the amount of $140,017 for each of 2010, 2011, and 2012, against both Dr. Reyes

12

and Mrs. Reyes.  *Id.* ¶ 53.  On or about October 22, 2019, a delegate of the Secretary of the

Treasury sent Dr. Reyes and Ms. Reyes notice of the assessments of these FBAR penalties and

demanded payment. *Id.* ¶ 54.

The unpaid balance on the FBAR assessments for Dr. Reyes for 2010, 2011, and 2012 as

of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals

under 31 U.S.C. § 3717, is $518,170.30; statutory additions continue to accrue from and after

February 21, 2023.  *Id.* ¶ 55.

The unpaid balance on the FBAR assessments for Mrs. Reyes for 2010, 2011, and 2012

as of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals

under 31 U.S.C. § 3717, is $518,170.30; statutory additions continue to accrue from and after

February 21, 2023.  *Id.* ¶ 56.

**ARGUMENT**

A.      **Summary Judgment Standard.**

Federal Rule of Civil Procedure 56(a) states that summary judgment should be granted to

the moving party "if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law."  A party seeking summary judgment

"bears the initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of [the record] which it believes demonstrate the absence of a genuine

issue of material fact."  *Dawes v. Pellechia*, 688 F. Supp. 842, 845 (E.D.N.Y. 1988) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Once this showing has been made, the

burden shifts to the nonmovant to demonstrate, through specific facts, that a genuine issue

remains for trial.  *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993).

B.      Background Law.

U.S. citizens (as well as residents and companies) must report their interests in foreign financial accounts under the Bank Secrecy Act of 1970, 31 U.S.C. §§ 5311 *et seq*. *See* 31 U.S.C. § 5314(a).  If such a person has a "financial interest in, or signature or other authority over, a bank, securities, or other financial account in a foreign country," then they must report "such relationship to the [IRS] for each year in which such relationship exists."  31 C.F.R. § 1010.350 (2011-2013).  The report is made by filing a completed form TD F 90-22.1, commonly referred to as an FBAR.  If the value of a person's foreign account exceeds $10,000 at any time during a calendar year, then that person must file an FBAR on or before June 30 of the following year.  *See* 31 C.F.R. § 1010.306(c) (2011-2013).  Persons who willfully fail to file an FBAR are subject to civil penalties under 31 U.S.C. § 5321 as determined by the IRS in its discretion—but the maximum penalty for a "willful" failure is either $100,000 or 50 percent of the balance in the account at the time of the violation, whichever is greater.  *See* 31 U.S.C. § 5321(a)(5)(C)-(D).

To prove its case against Juan Reyes, the government must show that: (1) Dr. Reyes was a citizen or legal resident of the United States; (2) he had an interest in, or signature or other authority over, a financial account; (3) the financial account had a balance that exceeded $10,000 during each year at issue; (4) the financial account was in a foreign country; (5) Dr. Reyes failed to file an FBAR disclosing the foreign financial account by June 30 of the following year; (6) Dr. Reyes's failure to file was willful; and (7) the amount of the civil penalties assessed against him were proper.  *See United States v. McBride*, 908 F. Supp. 2d 1186, 1201 (D. Utah 2012).  To prove its case against Catherine Reyes, the government must establish the same elements.

C.      **The United States Has Established All Elements of Its Civil FBAR Penalty Claim.**

        i.      **All Elements Other than Willfulness Should be Found to be Admitted.**

The undisputed material facts in this case establish all seven elements of a willful FBAR penalty for both Dr. Reyes and Mrs. Reyes.  The government expects that the only real dispute in this case will be with respect to the "willfulness" element.  All other elements (1-5, and 7) should be found to be admitted based on the following, undisputed facts.

Dr. Reyes and Mrs. Reyes are both United States citizens.  During years 2010-2012 the Lloyds Account was jointly owned by Dr. Reyes and Mrs. Reyes, and they each had signatory authority over the account.  The Lloyds Account had a high balance of $2,161,500 during 2010, $2,113,813 during 2011, and $2,086,955 during 2012.  The Lloyds Account was in Switzerland (a foreign country) during 2010-2012.  For years 2010-2012, Dr. Reyes and Mrs. Reyes failed to timely file an FBAR by June 30 of the following year, disclosing the Lloyds Account.

The amounts of the civil FBAR penalties assessed against them were proper.  For a willful violation, the maximum penalty is 50% of "the balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(D)(ii).  On October 11, 2019, the IRS assessed willful FBAR penalties of $420,051 against Dr. Reyes and willful FBAR penalties of $420,051 against Mrs. Reyes.  The amounts of the FBAR penalties assessed for each year against the Reyeses do not exceed the statutory cap of 50% of the account balance on the date of the violation (June 30 of the following year).  Instead, in its discretion the IRS assessed the penalty amounts for the three years at issue based upon 50% of the account balance for only one year; the IRS assessed the penalty based on 50% of the June 30, 2012, account balance, then divided in half to account for each spouse's interest, and then spread evenly across 2010-2012.  The IRS then exercised its

discretion to apply an additional 20% reduction to the penalty amounts, to which the Reyeses consented to immediate assessment and collection.

### ii.    The Defendants Willfully Failed to File an FBAR for Years 2010-2012.

The Defendants willfully failed to file an FBAR for years 2010-2012 with respect to the Lloyds Account.  The evidence amassed to date establishes that the Defendants' conduct is consistent with, and exceeds, the indicia of recklessness established in the FBAR case law.

The preponderance of the evidence standard applies in a civil FBAR action.  *United States v. Garrity*, 304 F. Supp. 3d 267, 271-73 (D. Conn. 2018).  Proof of an intentional failure to file an FBAR established willfulness.  *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1084 (S.D. Cal. 2021).  Proof of reckless conduct alone, however, is sufficient to satisfy the element of willfulness.  *Garrity*, 394 F. Supp. 3d at 273-74; *United States v. Schik*, 2022 WL 685415, at *5 (S.D.N.Y. Mar. 8, 2022); *United States v. Gentges*, 531 F. Supp. 3d 731, 743 (S.D.N.Y. 2021); *United States v. Bernstein*, 486 F. Supp. 3d 639, 646-48 (E.D.N.Y. 2020).   Under the reckless standard, it can be "inferred" that a person willfully failed to file an FBAR by showing that he undertook "a conscious effort to avoid learning about reporting requirements."  *United States v. Williams*, 489 F. App'x 655, 658 (4th Cir. 2012).

In determining willfulness, courts have relied on various indicia of recklessness:

- Submitting a federal tax return which falsely states that taxpayer had no foreign financial accounts during that tax year.  *See United States v. Collins*, 36 F.4th 487, 492 (3rd Cir. 2022); *United States v. Rum*, 995 F.3d 882, 890 (11th Cir. 2021); *United States v. Horowitz*, 978 F.3d, 80, 90 (4th Cir. 2020); *Williams*, 489 F. App'x at 659; *Kimble v. United States*, 991 F.3d 1238, 1243 (Fed. Cir. 2021); *Norman v. United States*, 942 F.3d 1111, 1116 (Fed. Cir. 2019); *Gentges*, 531 F.

16

Supp. 3d at 744-50; *Landa v. United States*, 153 Fed. Cl. 585, 597-99 (Fed. Cl. 2021); *United States v. Goldsmith*, 541 F. Supp. 3d 1058, 1094-97 (S.D. Cal. 2021); *Jones v. United States*, 2020 WL 4390390, at *9 (C.D. Cal. May 11, 2020); *McBride*, 908 F. Supp. 2d at 1206-08. *But see United States v. Schwarzbaum*, 2020 WL 1316232, at *8 (S.D. Fla. Mar. 20, 2020) (declining to impute constructive knowledge by signing tax return); *United States v. Flume*, 2018 WL 4378161, at *7 (S.D. Tex. Aug. 22, 2018) (same).

- Failure to make a simple inquiry to taxpayer's accountant regarding the foreign financial account, including any tax consequences therefrom. *See Horowitz*, 978 F.3d at 89-90; *Kimble*, 991 F.3d at 1243; *United States v. Mahyari*, 2023 WL 372656, at *8 (D. Or. Jan. 24, 2023); *Gentges*, 531 F. Supp. 3d at 750-51; *Landa*, 153 Fed. Cl. at 597-99; *United States v. DeMauro*, 483 F. Supp. 3d 68, 85-86 (D. N.H. 2020); *Goldsmith*, 541 F. Supp. 3d at 1092-94; *United States v. Ott*, 441 F. Supp. 3d 521, 530-31 (E.D. Mich. 2020); *United States v. Bohanec*, 263 F. Supp. 3d 881, 890 (C.D. Cal. 2016).

- Understanding that interest income from a domestic bank is taxable under U.S. law. *See Horowitz*, 978 F.3d at 89; *Goldsmith*, 541 F. Supp. 3d at 1101-04.

- Instructing the foreign bank where the foreign account was held to hold mail related to the account, and/or to not invest in U.S. securities. *Bedrosian v. United States*, 42 F.4th 174, 180 (3rd Cir. 2022); *Collins*, 36 F.4th at 492; *Rum*, 995 F.3d at 890; *Horowitz*, 978 F.3d at 90; *Norman*, 942 F.3d at 1116; *Gentges*, 531 F. Supp. 3d at 751; *Landa*, 153 Fed. Cl. at 597-99; *Goldsmith*, 541 F. Supp. 3d at

1097-1101, 1104-06.  *See also Ott*, 441 F. Supp. 3d at 531 (holding that

taxpayer's providing bank with sister's address was indicia of willfulness).

- Significance of foreign account to account holder's net worth.  *See Bedrosian*, 42

  F.4th at 180; *Horowitz*, 978 F.3d at 89-90; *Gentges*, 531 F. Supp. 3d at 735.

The Reyeses' failure to file an FBAR for 2010-2012 was willful.  The above indicia of

recklessness exist in this case.  There is no dispute that the Reyeses' original federal income tax

returns for 2010-2012 falsely stated that they had no foreign financial accounts, and the returns

failed to disclose their Lloyds Bank account and any income therefrom.  According to the

Reyeses' own testimony, they failed to make a simple inquiry to their longtime accountant about

the Lloyds Bank account.  Also, there is no dispute that the Reyeses understood that interest

income from domestic banks needed to be reported on their federal income tax returns.

Furthermore, there is no dispute that the Reyeses gave instructions to Lloyds Bank to hold mail

and paid the fees associated therewith, and that the Reyeses gave instructions to divest U.S.

securities.  In addition, Dr. Reyes, having a medical degree and practicing medicine for more

than 50 years, is a sophisticated taxpayer.  Mrs. Reyes handled the billings for Dr. Reyes's

medical practice and was familiar with the books and records necessary to prepare their joint

federal income return, testifying at deposition that she compiled that information for Mr.

Yoskowitz, their longtime CPA.  Both Dr. and Mrs. Reyes are part-owners in real-estate ventures

and have surrounded themselves with professionals who were in positions to either advise them

about the implications of the foreign account, or at the very least point them in right direction,

including their long-time CPA and their son, who is a lawyer and a partner at a national law firm.

Yet the Reyeses made a conscious effort to avoid learning about FBAR reporting requirements,

if they did not specifically know about them.  There is no dispute that the Reyeses knew about

the Lloyds Bank account at all times relevant to this litigation and used the funds in the account via credit cards linked to the account to pay for personal expenses.  Finally, the Reyeses admitted in their respective depositions that the Lloyds Bank account represented 75-90% of their total assets during the years at issue.

Rather than making a conscious effort to understand their requirements for reporting their foreign account, Dr. Reyes took affirmative steps to avoid reporting the Lloyds Account.  He chose to rely on an article that he allegedly read in a Nicaraguan newspaper that said individuals had no obligation to report accounts to the United States where the source of the funds occurred outside of the United States.  He consulted individuals who he believed were "international lawyers" outside of the United States for informal advice (they were not representing him) to support his belief.  *See Horowitz*, 978 F.3d at 90 ("[Defendants'] only explanation for not disclosing foreign interest income related to some unspecified conversations they had with friends in Saudi Arabia in the late 1980s. Yet, if the question of whether they had to pay taxes on foreign interest income was significant enough to discuss with their friends, they were reckless in failing to discuss the same question with their accountant at any point over the next 20 years.").  Mrs. Reyes knew of the account, benefited from the funds of the account via use of credit cards and to pay expenses in the United States during the years at issue, and instructed mail to be sent to a friend's address in Madrid to avoid detection.  They failed to inform their accountant, even though the disclosure of foreign accounts was specifically requested every year he prepared their returns.  The Reyeses' behavior was at least reckless, which is all the United States must prove; however, based on the undisputed facts in this case, it is clear they took both affirmative steps to avoid detection of the account and willfully turned a blind eye to their

requirements to report the account to the United States government.  Their failure to report the Lloyds Bank account was willful.

### D.      Defendants' Affirmative Defenses Lack Merit.

The Defendants raise affirmative defenses, Docket No. 8, at p. 4, and the United States requests that the Court rule in its favor on each of these affirmative defenses.

Most of Defendants' affirmative defenses are boilerplate defenses that the Court should summarily reject because they have no applicability here: (1) failure to state a claim upon which relief can be granted, (3) mistake, (5) waiver, equitable estoppel, or laches, (6) recoupment or set off, and (7) mistake (a repetition of Affirmative Defense No. 3).

Defendants' Affirmative Defense No. 2 (lack of willfulness or other requisite state of mind) should be rejected because, as explained above, Defendants willfully failed to file an FBAR for the years at issue.

The Court should also reject Defendants' Affirmative Defense No. 4 (statute of limitations) because the IRS timely assessed the FBAR penalties against the Defendants, and the United States timely filed suit.  On two separate occasions (March 31, 2017, and July 20, 2018), each Defendant signed a written consent to extend the time for the IRS to assess civil penalties provided by 31 U.S.C. § 5321 for FBAR violations.  The first consent extended the deadline to December 31, 2018.  The second consent extended the deadline to December 31, 2019.  The IRS timely assessed the FBAR penalties against Defendants on October 11, 2019.  Under 31 U.S.C. § 5321(b)(1), "[t]he Secretary of Treasury may assess a civil penalty under subsection (a) at any time before the end of the 6-year period beginning on the date of the transaction with respect to which the penalty is assessed."  31 U.S.C. § 5321(b)(1).  So for year 2010, the earliest year at issue in this case, the deadline to assess the FBAR penalty for that year was June 30, 2017 (6

years from the June 30, 2011, FBAR filing deadline), before consideration of agreements to extend the assessment deadline. The two cases that have dealt with the validity of agreements to extend the statute of limitations for assessing an FBAR penalty have upheld the validity of such agreements. *See United States v. Solomon*, 570 F. Supp. 3d 1195, 1201-02 (S.D. Fla. 2021) (holding that "[b]ecause 31 U.S.C. § 5321 is not jurisdictional, the limitations period for assessing FBAR penalties may be waived by the parties, even for claims that have expired"); *United States v. Schwarzbaum*, 2019 WL 3997132, at *4 (S.D. Fla. Aug. 22, 2019) (deciding that "[a]lthough Title 31 does not expressly authorize the extension of the applicable statute of limitations by agreement, it does not expressly prohibit such extensions"). As for the timeliness of this suit, the deadline for filing this action was October 11, 2021, which is the expiration of the two-year period following the date of assessment (October 11, 2019). *See* 31 U.S.C. § 5321(b)(2). The United States filed this action on October 7, 2021, four days before the statutory deadline for bringing suit. Therefore, the Court should rule in the United States favor on Defendants' Affirmative Defense No. 4.

## CONCLUSION

For all of the reasons set forth above, the Court should enter an order granting summary judgment in favor of the United States.

Dated: February 28, 2023

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

*/s/ Philip L. Bednar*
PHILIP L. BEDNAR (WA State No. 41304)
JULIA M. GLEN (MN Bar No. 0399238)
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C.  20044
202-307-6415 (v) (plb)
202-598-3280 (v) (jmg)
202-514-5238 (f)
Philip.L.Bednar@usdoj.gov
Julia.M.Glen@usdoj.gov

Of Counsel:

BREON PEACE
United States Attorney

## CERTIFICATE OF SERVICE

I certify that on February 28, 2023, I served by electronic mail the foregoing document

on the following counsel of record:

> Richard E. Lerner, Esq.
> Mazzola Lindstrom LLP
> 1350 Avenue of the Americas, Second Floor
> New York, NY  10019
> Email:  richard@mazzolalindstrom.com
> **Counsel for the Defendants**

Pursuant to this Court's individual rules, the foregoing document will only be filed when

the Motion has been fully briefed, at which time the United States as movant will file the full set

of Motion papers with the Court using the CM/ECF system, which will send notification of such

filing to all registered CM/ECF participants.


*/s/ Philip L. Bednar*

PHILIP L. BEDNAR
Trial Attorney
Civil Trial Section, Northern Region