UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------x

UNITED STATES OF AMERICA,

    *Plaintiff,*

    *v.*

JUAN REYES and
CATHERINE REYES,

    *Defendants.*

---------------------------------x

No. 1:21-cv-05578

Dist. Judge Margo K. Brodie

Mag. Judge Peggy Kuo

# PLAINTIFF UNITED STATES' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, and in support of its motion for summary judgment in the above-captioned case, the Plaintiff United States of America submits this statement of undisputed material facts.

    **A.**    **Defendants' Background.**

    1.    Dr. Juan Reyes is a United States citizen, and he was a United States citizen during calendar years 2010, 2011, and 2012. Declaration of Julia M. Glen ("Glen Decl."), Ex. C (J. Reyes Dep.), at 14:23-25; 15:1-7. Dr. Reyes was born in Nicaragua and is a dual citizen of Nicaragua and the United States. *Id.* 15:8-12. He moved to the United States in 1960. *Id.* 14:15-18.

    2.    Catherine Reyes is a United States citizen, and she was a United States citizen during calendar years 2010, 2011, and 2012. Glen Decl., Ex. C (J. Reyes Dep.), at 35: 2-3; Ex. D (C. Reyes Dep.), at 20:25; 21:1-2. Mrs. Reyes was born in the United States and is a dual citizen of Ireland and the United States. Glen Decl., Ex. D (C. Reyes Dep.), at 20:25; 21:1-9. Sometimes Mrs. Reyes chooses to spell her first name Katherine, but her legal name is

1

Catherine. Glen Decl., Ex. C (J. Reyes Dep.), at 34:12-20; Ex. D (C. Reyes Dep.), at 9:11-20. Dr. Reyes and Mrs. Reyes have been married to each other for 57 years. Glen Decl., Ex. C (J. Reyes Dep.), at 34:8 -23; Ex. D (C. Reyes Dep.), at 22:18-24.

3. In 2010-2012, Dr. Reyes was, and he still is, employed as a doctor in private practice in New York, New York. Glen Decl., Ex. C (J. Reyes Dep.), at 14:2-14. Dr. Reyes has his own medical practice, which does business through a professional corporation named "Juan D. Reyes, M.D., P.C." that has been solely owned by Dr. Reyes since its inception. *Id.* 25:8-26:5. Dr. Reyes attended college in Leon, Nicaragua. *Id.* 12:2. In 1957, Dr. Reyes obtained a medical degree from the National University of Mexico in Mexico City, Mexico. *Id.* 12:17-25; 13:1-3. After moving to the United States, Dr. Reyes attended New American College and New York University so he could pursue additional medical education. *Id.* 12:7-8, 14:19-22. Upon working at the Veterans Administration in New York, he became proficient in thoracic surgery and general surgery. *Id.* 12:9-12.

4. In 2010-2012, Mrs. Reyes assisted Dr. Reyes with his medical practice; one of her duties included billing insurance companies. Mrs. Reyes still works with Dr. Reyes in this capacity. Glen Decl., Ex. C (J. Reyes Dep.), at 35:6-16; 20-24; Glen Decl., Ex. D (C. Reyes Dep.), at 12:8-20.

5. The Reyeses, together with their son, Juan Reyes, III, own two LLCs: 91 Avaline LLC and 424 Avaline LLC. With respect to each entity, Dr. Reyes owns 90%, Mrs. Reyes owns 5%, and Juan Reyes, III, owns the remaining 5%. Each of these entities owns one building located in New York City. In the building owned by 91 Avaline LLC, the residential spaces are leased out to tenants, and Dr. Reyes uses the commercial space to run his medical practice, primarily serving low-income individuals. The building owned by 424 Avaline LLC currently

2

has ongoing renovations, and upon completion of the renovations and obtaining a certificate of occupancy, it is anticipated that the building will be leased to various tenants. Glen Decl., Ex. C (J. Reyes Dep.), at 26:6-33:11; Ex. D (C. Reyes Dep.), at 15:14-24.

6. Dr. Reyes and Mrs. Reyes have three children: Alexander Reyes, who prior to his passing in 2003, worked for JP Morgan Chase Bank, N.A.; Juan Reyes III, an attorney in New York City, where he is a partner at a law firm; and Catherine Reyes, a teacher in New York City. Glen Decl., Ex. C (J. Reyes Dep.), at 37:4-41:22; Glen Decl., Ex. D (C. Reyes Dep.), at 23:3-25; 24:1-14; 156:22-25; 157:3-5.

7. Neither Dr. Reyes nor Mrs. Reyes ever resided in the United Kingdom, Spain, or Switzerland. Glen Decl., Ex. C (J. Reyes Dep.), at 17: 10-13; 15:19-21; 16:4-7; Ex. D (C. Reyes Dep.), at 16:25; 17: 1-3; 17:7-9.

8. Aside from the owning the bank account that is at issue in this litigation, neither Dr. Reyes nor Mrs. Reyes ever conducted business in the United Kingdom, Spain, or Switzerland. Glen Decl., Ex. C (J. Reyes Dep.), at 17:14-25; 18:1-13; 16:8-25; 17:1-6; Ex. D (C. Reyes Dep.), at 17:10-18; 17:19-25; 18:1-5.

**B.     The Foreign Bank Account.**

9. In or around 1972, Dr. Reyes's parents opened a bank account in Dr. Reyes's name in Nicaragua at Banco de Londres y America del Sur ("Banco de Londres"). Glen Decl., Ex. C (J. Reyes Dep.), at 42:14-23; 45:17-21. Dr. Reyes's parents provided the initial funds to start the bank account, which totaled approximately $200,000. *Id.* 43:2-7; 46:3-13. Dr. Reyes's parents passed away in or around 2003. *Id.* 36:5-9.

10. Banco de Londres became part of Lloyds Bank, and on or about April 19, 1994, a joint account in the name of Dr. Reyes and Mrs. Reyes was established at Lloyds Bank PLC in

3

the United Kingdom.  Glen Decl., Ex. C (J. Reyes Dep.), at 46:22-47:19; Glen Decl., Ex. D (C. Reyes Dep.), at 82:18-23; Glen Decl., Ex. E; Glen. Decl., Ex. F.  Dr. Reyes and Mrs. Reyes's joint account at Lloyds Bank PLC, which was later moved to Lloyds TSB Bank in Switzerland, had an account number ending in 250 ("the Lloyds Account"), also referred to as a Client ID Number.  Glen Decl., Ex. C (J. Reyes Dep.), at 46:22-47:19, 72:15-25; Glen Decl., Ex. D (C. Reyes Dep.), at 87:10-16; *see* Glen Decl., Ex. E; Glen Decl., Ex. G.  During 2010-2012, the Lloyds Account was with Lloyds TSB Bank in Switzerland.  Glen Decl., Ex. V.

11. The Lloyds Account was comprised of three components: (1) a cash account; (2) money market instruments and money market funds; and (3) securities.  Glen Decl., Ex. C (J. Reyes Dep.), at 63:10-22; Glen Decl., Ex. D (C. Reyes Dep.), at 88:5-17; Glen Decl., Ex. G.

12. Dr. Reyes and Mrs. Reyes both had signatory authority over the Lloyds Account from its creation as a joint account in 1994 until it was closed in 2013.  Glen Decl., Ex. C (J. Reyes Dep.), at 58:8-20; Glen Decl., Ex. H.

13. In or around 2000, Dr. Reyes and Mrs. Reyes met with a Lloyds Bank representative, Mr. Bernard Gaughran, in the United Kingdom to discuss the status of the Lloyds Account, discussing that if the Reyeses needed to withdraw money from the account, they could do so by way of a credit card.  Glen Decl., Ex. C (J. Reyes Dep.), at 20:21-25; 21:1-25; 22:1-2; 24:6-9.  Dr. Reyes met with Mr. Gaughran on other occasions to discuss the Lloyds Account.  *Id.* at 22:3-7; 142:4-23.  Dr. Reyes would communicate via telephone, fax, or letter with Mr. Gaughran sporadically throughout the time the Lloyds Account was open.  *Id.* at 136:14-25; 137: 1-23; 140:21-25.

14. Dr. Reyes and Mrs. Reyes requested that Lloyds Bank keep mail, or retain all account related correspondence, rather than having it sent to them at their designated address in

4

the United States. Glen Decl., Ex. I. Dr. Reyes and Mrs. Reyes would sporadically receive information about the Lloyds Account only upon their request. Glen Decl., Ex. C (J. Reyes Dep.) at 95-96; Glen Decl., Ex. D (C. Reyes Dep.), at 144:7-24; Glen Decl., Ex. I; Ex. J, (pg. 1 statement says, "Keep Mail"); *see also* Glen Decl., Ex. C (J. Reyes Dep.), at 63:23-25; 64:1-24; 65:25; 66:1-9 (stating that they only received statements from Lloyds Bank at their request, sporadically); 87: 13-21 (sporadic requests for credit card statements); 94:10-25; 95: 1-12; Glen Decl., Ex. D (C. Reyes Dep.), at 104:22-25; 105:1-20 (never saw and never looked for statements). The Reyeses paid a fee to Lloyds Bank for the hold mail service – for example, they paid $109.47 in September 2012 to Lloyds Bank for a hold mail service. Glen Decl., Ex. C (J. Reyes Dep.), at 99:11-25; 100:1-3.

15. Dr. Reyes and Mrs. Reyes closed the account at the end of 2013 or early 2014, transferring all of the funds in the account to a J.P. Morgan Chase bank account in the United States. Glen Decl., Ex. C (J. Reyes Dep.), at 49:4-17.

16. During 2010, 2011, and 2012, the Lloyds Account represented between 75% and 90% of the Reyes' wealth. Glen Decl., Ex. C (J. Reyes Dep.), at 126:1-21; Glen Decl., Ex. D (C. Reyes Dep.), at 161:15-162:11.

### C. Use of the Lloyds Account and Efforts Taken to Conceal the Lloyds Account from the United States.

17. Dr. Reyes and Mrs. Reyes instructed Lloyds Bank to divest their U.S. securities and to avoid the U.S. income tax withholdings, and Mrs. Reyes signed a form requesting the same. Glen Decl., Ex. C (J. Reyes Dep.), at 100:13-17; Glen Decl., Ex. D (C. Reyes Dep.), at 136:4-25; Glen Decl., Ex. K.

18. In 2010, 2011, and 2012, Dr. Reyes and Mrs. Reyes had credit cards linked to the Lloyds Account to allow them to use funds from the Lloyds Account to sustain their lifestyle in

5

the United States and abroad, and to help move their family out of Nicaragua. Glen Decl., Ex. C (J. Reyes Dep.), at 22:18-24; 23:5-18; 86:15-24; 92:3-22. One example is that Mrs. Reyes had a credit card with UBS ending in 7578, and the Reyeses used the Lloyds Account to pay the balance on that UBS credit card. Glen Decl., Ex. D (C. Reyes Dep.), at 126:7-23.

19. Dr. Reyes and Mrs. Reyes also used the Lloyds Account to pay the balance of other credit cards between 2007 and 2012. Glen Decl., Ex. C (J. Reyes Dep.), at 78:19-25; 79:2-6 (USB 2012); 80:21-25; 81:1-17 (Mastercard Gold 2012); 84: 20-25; 85:1-3 ("Q: [I]s it fair to say that you and your wife were…using credit cards linked to the Lloyds Bank account between 2007 and 2012? A: Yes"); 114:6-11.

20. During the years at issue in this litigation, Dr. Reyes and Mrs. Reyes used the Lloyds Account to pay domestic expenses, including numerous payments to Wells Fargo and transfers to their JP Morgan Chase bank account in the United States. *See* Glen Decl., Ex. J; Glen Decl., Ex. A, ¶ 4; Glen Decl., Ex. B, ¶ 4.

21. The Reyeses shielded the use of the Lloyds Account to pay for their living expenses in the United States in various ways. For example, Mrs. Reyes requested to pick up one credit card, a Maestro Card linked to the Lloyds Account, at a bank location in Madrid, Spain, rather than having it mailed to her home in New York. Glen Decl., Ex. D (C. Reyes Dep.), at 118:9-25; Glen Decl., Ex. C (J. Reyes Dep.), at 93:2-25; Glen Decl., Ex. L.

22. Additionally, Mrs. Reyes directed her Eurocard statements be sent to a family friend's address in Madrid, rather than her home address in the United States. Glen Decl., Ex. D (C. Reyes Dep.), at 138:13-25; 139-140; Glen Decl., Ex. C (J. Reyes Dep.), at 90: 24-25; 91: 2-9; Ex. M.

6

### D. Preparation of Federal Income Tax Returns for 2010-2012 by Sidney Yoskowitz.

23. Sidney Yoskowitz, the Reyeses' trusted accountant, prepared and filed their original 2010-2012 federal income tax returns. Glen Decl., Ex. C (J. Reyes Dep.), at 144:4-18; Glen Decl., Ex. D (C. Reyes Dep.), at 27:2-7; Glen Decl. Ex. A, ¶ 1; Glen Decl. B. ¶ 1.

24. Dr. Reyes and Mrs. Reyes worked with Mr. Yoskowitz for approximately 40 years before Mr. Yoskowitz's retirement. Glen Decl., Ex. C (J. Reyes Dep.), at 144:19-23; Glen Decl., Ex. N. Dr. Reyes believed he received good advice from Mr. Yoskowitz throughout their relationship as a CPA, in which he prepared their tax returns and also gave them tax advice on their LLCs. Glen Decl., Ex. C (J. Reyes Dep.), at 145:21-25; 146:1-22.

25. Mr. Yoskowitz's routine practice during the years he worked for the Reyeses was to send what he referred to as a "client organizer" to his clients every year to assist him in preparing their federal income tax returns. Glen Decl., Ex. N. Mr. Yoskowitz's custom and practice was to ask his clients if they had any foreign income. *Id.* The Reyeses never returned the client organizer, but instead they would send Forms 1099 for their income. *Id.*

26. During tax return preparation season, Dr. Reyes and Mrs. Reyes compiled documents Dr. Reyes received from insurance companies for work he did through his medical practice and Forms 1099 the Reyeses received from banks, where Dr. Reyes and Ms. Reyes held their domestic bank accounts. They provided this documentation to Mr. Yoskowitz to prepare their returns. Glen Decl., Ex. C (J. Reyes Dep.), at 158:11-25; 159:18-25; 160:3-7 (2010); 176:16-25; 177:1-25 (2011); 187:10-25 (2012); Glen Decl., Ex. D (C. Reyes Dep.), at 28:13-25; 65:22-25; 66-68:24 (discussion of sending Forms 1099 and information from Chase Bank to Yoskowitz).

7

27. Dr. Reyes and Mrs. Reyes did not disclose the existence of the Lloyds Account to their longtime tax return preparer, Mr. Yoskowitz, when he prepared their original income tax returns for the tax years 2010-2012. Glen Decl., Ex. C (J. Reyes Dep.), at 161:2-8; 167:14-24; Glen Decl., Ex. D (C. Reyes Dep.), at 31:10-21; Glen Decl., Ex. N. The Reyeses did not provide Mr. Yoskowitz with any information about the Lloyds Account because, according to Dr. Reyes, it was "not income in the United States…[Dr. Reyes] didn't feel the obligation that we have to this country with this account." Glen Decl., Ex. C (J. Reyes Dep.), 161:2-15.

28. After Mr. Yoskowitz prepared the Reyeses' 2010-2012 income tax returns, Dr. Reyes reviewed the returns for accuracy, and signed and returned them to Mr. Yoskowitz for filing with the IRS. Glen Decl., Ex. C (J. Reyes Dep.), at 165:5-16 (2010); 176:16-19 (2011); 189:2-16 (2012).

29. According to Mrs. Reyes, she did not review the Reyeses' 2010-2012 joint federal income tax returns after they were prepared by Mr. Yoskowitz for accuracy prior to signing. Glen Decl., Ex. D (C. Reyes Dep.), at 30:1-16; 36: 8-17; 37:5-9 ("If Sidney sent it to me I signed it."). She knew Mr. Yoskowitz prepared the returns and Mrs. Reyes testified, "if Sidney sent it to me, I signed it." *Id.* 37:5-9.

30. Mr. Yoskowitz learned about the Reyeses' foreign income and existence of the Lloyds Account in 2014 when the Reyeses' counsel asked Mr. Yoskowitz to prepare amended federal income tax returns for income tax years 2005-2014. Glen Decl., Ex. N.

**E.      Filing Federal Income Tax Returns for 2010-2012 and Failure to Timely File FBARs.**

31. Dr. Reyes and Mrs. Reyes filed joint federal income tax returns for the tax years 2010-2012. Glen Decl., Ex. C (J. Reyes Dep.), at 143:8-21; Glen Decl., Ex. O (Income Tax 2010 Return; Ex. P (2011 Income Tax Return); Ex. Q (2012 Income Tax Return); *see* Glen

8

Decl., Ex. C (J. Reyes Dep.), at 149:3-8; 175:17-19, 24-25; 176:1-12; 184:9-24; 185:1-9; Glen Decl., Ex. D (C. Reyes Dep.), at 26:14-25.

32. Dr. Reyes and Mrs. Reyes's originally-filed joint federal income tax returns for 2010-2012 failed to disclose the existence of the Lloyds Account. Glen Decl., Ex. O (Income Tax 2010 Return; Ex. P (2011 Income Tax Return); Ex. Q (2012 Income Tax Return). On the Schedule B of their originally-filed joint federal income tax returns for 2010-2012, Dr. Reyes and Mrs. Reyes checked "no" in response to the question on Schedule B of whether they had an interest in or a signature or other authority over a financial account (including bank accounts, securities account, or other financial account), in a foreign country. Glen Decl., Ex. C (J. Reyes Dep.), at 150:21-25; 151:1-10; 178:10-25; 179:10 (2011); 185:10-25; 186:1-10 (2012); Glen Decl., Ex. O (2010 Income Tax Return); Glen Decl., Ex. P (2011 Income Tax Return), Glen Decl., Ex. Q (2012 Income Tax Return).

33. Dr. Reyes and Mrs. Reyes did not report any income from the Lloyds Account on their originally-filed joint federal income tax returns for the tax years 2010-2012. Glen Decl., Ex. O (2010 Income Tax Return); Ex. P (2011 Income Tax Return); Ex. Q (2012 Income Tax Return).

34. Dr. Reyes and Mrs. Reyes failed to timely file an FBAR for the Lloyds Account for each of the calendar years 2010, 2011, and 2012, by June 30 of the following year, when the FBAR was due. Declaration of Kimberly Nguyen ("Nguyen Decl.), ¶ 4.

**F.    Dr. Reyes and Mrs. Reyes Did Not Seek Any Advice from Professionals on Tax Implications and Reporting Requirements Regarding the Account.**

35. According to their testimony, Dr. Reyes and Mrs. Reyes did not consult with any professional advisor, accountant (including Mr. Yoskowitz), or other advisor regarding the U.S. tax implications or reporting requirements for the Lloyds Account, until late 2013, when the

9

Reyeses consulted with an attorney in conjunction with the closing of the Lloyds Account and moving the funds to the United States. Glen Decl., Ex. C (J. Reyes Dep.), at 49:4-9; 161:2-15; 175:2-7; 180:10-181:7; 197:12-21; Ex. N.

36. When signing and submitting the originally-filed joint 2010-2012 income tax returns, Dr. Reyes was aware that the United States required its citizens to report certain financial interests they had outside of the United States; however, he stated he did not believe that those requirements applied to the Reyeses with respect to the Lloyds Account. Dr. Reyes testified during his deposition that he did not report the Lloyds Account because he believed that if you were a citizen of another country, and the money was generated in that country, then the United States did not have jurisdiction over the foreign account. Glen Decl., Ex. C (J. Reyes Dep.), at 155:8-25. His belief was based on a newspaper article written by an individual named "Robert Malta Grossman," once published in a Nicaraguan newspaper, and on conversations with individuals he identified as "international lawyers." Glen Decl., Ex. C (J. Reyes Dep.), at 150:21-25; 151-157 (discussion of Grossman article); 173:15-25: 174:1-12; 179:25; 180-181:1-7 (discussion of other international lawyers Dr. Reyes discussed this with, stating "I knew them but not as my lawyers, or in that capacity, but it came out through the conversation if I want to return to Nicaragua, things like this," and whether he sought out his own lawyer to determine reporting requirements). Specifically, Dr. Reyes said he did not have a requirement to report his financial interests outside of the United States because, "if you have an account outside the country where you are a citizen, that money belong, it's on the jurisdiction where the money was generated, and my understanding is the money was generated in Nicaragua. It was not in the jurisdiction for the United States." *Id.* 154:6-15. Dr. Reyes further testified that if he brought the money into the United States, then he would have to pay tax on the money, but only at that time and only tax.

10

*Id.* 156:2-14.  Despite having a longtime CPA (Mr. Yoskowitz), a son who worked in the banking industry, and another son who practiced as an attorney, Dr. Reyes stated that it never occurred to him, according to his own testimony, to seek out professional advice within the United States to determine reporting requirements for the Lloyds Account.  *Id.* at 180:10-181:7.

      37.     Dr. Reyes claims that he became aware of the FBAR reporting requirement around late 2013, when he sought to repatriate the funds in the Lloyds Account.  Glen Decl., Ex. C (J. Reyes Dep.), at 194:5-21.

      **G.**     **Amended Income Tax Returns for 2010-2012.**

      38.     In 2014, Dr. Reyes and Mrs. Reyes requested Mr. Yoskowitz to prepare and file amended federal income tax returns for income tax years 2010, 2011, and 2012.  Glen Decl., Ex. C (J. Reyes Dep.), at 166:14-25; 167:2-13, 25; 168:1-5; Glen Decl., Ex. R (Amended 2010 Tax Return); Ex. S (Amended 2011 Tax Return); Ex. T (Amended 2012 Tax Return); Glen Decl., Ex. C (J. Reyes Dep.), at 169:14-21 (2010); 181:18-25 (2011); 189:1-18; Glen Decl., Ex. D (C. Reyes Dep.), at 38:7-13 (2010); 46:6-10 (2011); 56: 4-17 (2012); Ex. N.

      39.     The amended income tax returns for 2010, 2011, and 2012 disclosed the existence of, and interest income from, the Lloyds Account.  Glen Decl., Ex. C (J. Reyes Dep.), at 171:10-25; 172-173:1-14(2010); 182: 16-25; 183: 1-22; 190: 19-25; 191-192:1-6; Glen Decl., Ex. D (C. Reyes Dep.) 38:1-21 (2010); 48:5-19 (2011); 56:18-25; 57 (2012); Glen Decl., Ex. RS (Amended 2010 Tax Return); Ex. S (Amended 2011 Tax Return); Ex. TU (Amended 2012 Tax Return).

11

### H. Entrance Into and Withdrawal From OVDP.

40. In 2014, Dr. Reyes and Mrs. Reyes requested entry into the Department of Treasury's Offshore Voluntary Disclosure Program ("OVDP") for calendar years 2005-2012. Glen Decl., Ex. D (C. Reyes Dep.), at 178:8-11; 179:21-25; 180:1-22; Glen Decl., Ex. U.

41. The purpose of OVDP during the years at issue (2010-2012) was to bring taxpayers who had previously used undisclosed foreign accounts and assets to avoid or evade taxes into compliance with the United States' tax and related laws. Nguyen Decl., ¶ 9.

42. On March 4, 2014, as part of OVDP, Dr. Reyes and Mrs. Reyes submitted Offshore Voluntary Disclosures to the IRS, disclosing the existence of the Lloyds Account from 2005 to 2012. Glen Decl., Ex. U. The Reyeses admitted the account had a balance between $1,000,000 and $2,500,000 from 2005 to 2012 and estimated the income the account made for those years was between $0 and $100,000. *Id.*

43. As part of their entrance into OVDP, on or about October 2, 2014, Dr. Reyes and Ms. Reyes filed delinquent FBARs with amended income tax returns for 2010-2012. Glen Decl., Ex. V.

44. Dr. Reyes and Mrs. Reyes withdrew from OVDP in October 2016 because they believed that "the penalties were too high." Glen Decl., Ex. C (J. Reyes Dep.), at 203:3-16; 200: 6-22; Glen Decl., Ex. D (C. Reyes Dep.) 181:5-10; 13-21. At his deposition, Dr. Reyes testified that the IRS sought $600,000, and the Lloyds Account balance at the time was around $2 million. *Id.* 201:8-19; 202:14-21.

I. **IRS Willful FBAR Penalty Assessment.**

45. The Reyeses consented to extend the time for the IRS to assess civil penalties under 31 U.S.C. § 5321 for FBAR violations. Glen Decl., Ex. X (Statute Extensions (JR)); Glen Decl., Ex. W (Statute Extensions (CR)); Nguyen Decl., Exs. X and W.

46. Upon their withdrawal from OVDP, the IRS thereafter opened an examination to determine Dr. Reyes and Mrs. Reyes's compliance with filing of FBARs for 2010-2012. Glen Decl., Ex. Y.

47. The IRS determined from its examination that Dr. Reyes and Mrs. Reyes willfully failed to timely report on an FBAR their financial interest in the Lloyds Account by the deadline for calendar years 2010, 2011, and 2012. Glen Decl., Ex. AA; Glen Decl., Ex. BB; Nguyen Decl., ¶ 4.

48. In 2010, 2011, and 2012 the highest balances of the Lloyds Account were: $2,161,500 (2010), $2,113,813 (2011), and $2,086,955 (2012). Glen Decl., Ex. V.

49. In 2010, 2011, and 2012 the Account had the following balances as of June 30, of the following year, respectively: $2,113,813, $2,064,258, and $2,101,330. Glen Decl., Ex. BB; Glen Decl., Ex. CC.

50. Initially, the IRS Examiner determined that for years 2010-2012 the total willful FBAR penalty pursuant to the statutory maximum under 31 U.S.C. § 5321(a)(5)(C) and (D) for Dr. Reyes was $3,139,701, and the same amount for Mrs. Reyes. This amount was calculated by multiplying 50% by the account balance on June 30 of the following year, then adding together the resulting amounts for years 2010, 2011, and 2012. Using her discretion, permissible by the Internal Revenue Manual, the IRS examiner determined that the taxpayers qualified for mitigation. The IRS examiner decided that appropriate FBAR penalties for 2010-1012 were:

$172,022 for 2010, $172,022 for 2011, and $172,021, for 2012, for Dr. Reyes, and the same amounts for Mrs. Reyes.  These amounts were calculated by multiplying the June 30, 2012, account balance ($2,064,258) by 50%, and then multiplying the resulting amount ($1,032,129) by 50% to account for each spouse's one-half ownership in the account, and then spreading the resulting amount ($516,065) evenly across years 2010-2012.  Glen Decl. Ex. Z (lead sheets for Juan Reyes); Glen Decl., Ex. AA (lead sheets for Catherine Reyes); Glen Decl., Ex. DD (Letter 3709 to Juan Reyes); Glen Decl., Ex. EE (Letter 3709 to Catherine Reyes); Nguyen Decl., ¶ 5.

51. After Dr. Reyes and Mrs. Reyes submitted a formal protest and the IRS did an additional review, the IRS ultimately determined that an additional 20% discount would be appropriate.  Thus, the assessments for FBAR penalties for each of the Reyeses' failure to report the foreign bank account at Lloyds Bank ending in 250 were as follows: $140,017 for 2010, $140,017 for 2011, and $140,017 for 2012, totaling $420,051.  These assessments were made against both Dr. Reyes and Mrs. Reyes.  Glen Decl., Ex. FF; Glen Decl., Ex. GG; Nguyen Decl. ¶ 6.

52. Dr. Reyes and Mrs. Reyes separately signed an IRS Form 13449, Agreement to Assessment and Collection of Penalties under 31 U.S.C. 5321(a)(5) and 5321(a)(6), on October 9, 2019, in which they each consented to the immediate assessment and collection of FBAR penalties totaling $420,051.  Glen Decl. Ex. JJ; Glen Decl., Ex. KK; Nguyen Decl. ¶ 7.

53. On October 11, 2019, the IRS assessed civil FBAR penalties in the amount of $140,017 for each of 2010, 2011, and 2012, against both Dr. Reyes and Mrs. Reyes.  Glen Decl. Ex. FF; Glen Decl. Ex. GG.

54. On or about October 22, 2019, a delegate of the Secretary of the Treasury sent Dr. Reyes and Ms. Reyes notice of the assessments of the FBAR penalties and demanded payment. Nguyen Decl., Ex. HH; Nguyen Decl., Ex. II.

55. The unpaid balance on the FBAR assessments for Dr. Reyes for 2010, 2011, and 2012 as of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, is $518,170.30; statutory additions continue to accrue from and after February 21, 2023.  Declaration of Deborah D. Cox ("Cox Decl."), ¶ 4.

56. The unpaid balance on the FBAR assessments for Mrs. Reyes for 2010, 2011, and 2012 as of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, is $518,170.30; statutory additions continue to accrue from and after February 21, 2023.  Cox Decl., ¶ 5.

Dated: February 28, 2023

          DAVID A. HUBBERT
          Deputy Assistant Attorney General
          U.S. Department of Justice, Tax Division

          */s/ Philip L. Bednar*
          PHILIP L. BEDNAR (WA State No. 41304)
          JULIA M. GLEN (MN Bar No. 0399238)
          Trial Attorneys, Tax Division
          U.S. Department of Justice
          P.O. Box 55
          Washington, D.C.  20044
          202-307-6415 (v) (plb)
          202-598-3280 (v) (jmg)
          202-514-5238 (f)
          Philip.L.Bednar@usdoj.gov
          Julia.M.Glen@usdoj.gov

Of Counsel:

BREON PEACE
United States Attorney

## CERTIFICATE OF SERVICE

I certify that on February 28, 2023, I served by electronic mail the foregoing document on the following counsel of record:

Richard E. Lerner, Esq.
Mazzola Lindstrom LLP
1350 Avenue of the Americas, Second Floor
New York, NY  10019
Email:  richard@mazzolalindstrom.com
**Counsel for the Defendants**

Pursuant to this Court's individual rules, the foregoing document will only be filed when the Motion has been fully briefed, at which time the United States as movant will file the full set of Motion papers with the Court using the CM/ECF system, which will send notification of such filing to all registered CM/ECF participants.

*/s/ Philip L. Bednar*

PHILIP L. BEDNAR
Trial Attorney
Civil Trial Section, Northern Region