UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Case No. 21-cv-05578

-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                Plaintiff,

  -against-

JUAN REYES and CATHERINE REYES,

                Defendants.
-----------------------------------------------------------x

## Notice of Appeal

    Notice is hereby given that defendants Juan Reyes and Catherine Reyes hereby appeal to the United States Court of Appeals for the Second Circuit from each and every aspect of the January 10, 2024 order herein (ECF 25) granting summary judgment against them.

Dated:  New York, New York
         January 31, 2024

**MAZZOLA LINDSTROM LLP**

Richard E. Lerner
*Counsel for defendants Juan Reyes and Catherine*
1350 Avenue of the Americas, Second Floor
New York, New York 10019
917-584-4864
646.216.8300
richard@mazzolalindstrom.com

**Service Via ECF**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
UNITED STATES OF AMERICA,

                Plaintiff,          **MEMORANDUM & ORDER**
                                       21-CV-5578 (MKB)

      v.

JUAN REYES and CATHERINE REYES,

                Defendants.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff the United States of America commenced the above-captioned action against Defendants Dr. Juan Reyes and Catherine Reyes on October 7, 2021. (Compl., Docket Entry No. 1.) The government asserts claims pursuant to 31 U.S.C. §§ 3711(g)(4)(C) and 5321(a)(5) to collect outstanding civil penalties it alleges Defendants owe due to their failure to timely file a Report of Foreign Bank and Financial Accounts ("FBAR") to report their financial interest in a jointly-held foreign financial account from 2010 to 2012. (Compl. ¶¶ 7–9, 16, 32.)

        The government moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, as to its claims against both Defendants.[1] For the reasons set forth below, the Court grants the government's motion for summary judgment.

---

[1] (Gov't Not. of Mot. for Summ. J. ("Gov't Mot."), Docket Entry No. 22-1; Gov't Mem. of Law in Supp. of Gov't Mot. ("Gov't Mem."), Docket Entry No. 22; Gov't Reply Mem. in Supp. of Gov't Mot. ("Gov't Reply Mem."), Docket Entry No. 22-49; Defs.' Mem. of Law in Opp'n to Gov't Mot. ("Defs.' Mem."), Docket Entry No. 24-1.)

I. **Background**

   a. **Factual background**

The following facts are undisputed unless otherwise noted.[2]

   i. **The Lloyds Account**

Defendants are United States citizens. (Gov't 56.1 ¶¶ 1–2.) In or around 1972, Juan's[3] parents opened a bank account in his name in Nicaragua at Banco de Londres y America del Sur ("Banco de Londres"). (*Id.* ¶ 9.) Juan's parents provided the initial funds to start the bank account, which totaled approximately $200,000. (*Id.*) Banco de Londres became part of Lloyds Bank, and on or about April 19, 1994, Defendants established the account as a joint account at Lloyds Bank PLC in the United Kingdom. (*Id.* ¶ 10.) Defendants later moved the account to Lloyds TSB Bank in Switzerland ("the Lloyds Account"), which is where the account was held during the period of 2010 to 2012. (*Id.*) The Lloyds Account was comprised of three components: (1) a cash account; (2) money market instruments and money market funds; and (3) securities. (*Id.* ¶ 11.)

Defendants both had signatory authority over the Lloyds Account from its creation as a joint account in 1994 until it was closed in 2013. (*Id.* ¶ 12.) Defendants directed the bank and paid it a fee to retain all account related correspondence, or "keep mail," rather than having it sent to Defendants at their designated address in the United States, and also directed at least once that the bank send Catherine's credit card statements associated with the account to a family friend's address in Madrid. (Gov't Ex. I, Docket No. 22-15; Gov't 56.1 ¶¶ 14, 22.) A document

---

[2] The Court relies on the parties' statements of undisputed material facts. (Gov't Rule 56.1 Stmt. of Undisputed Material Facts ("Gov't 56.1"), Docket Entry No. 22-2; Defs.' Resp. to Gov't Rule 56.1 Stmt. of Undisputed Material Facts ("Defs.' 56.1 Resp."), Docket Entry No. 24.)

[3] For ease of reference, the Court will refer to the parties by their given names.

2

from August of 2000 signed by Defendants directed Lloyds Bank to divest their U.S. securities. (Gov't 56.1 ¶ 17; Gov't Ex. K, Docket Entry No. 22-17.)

### ii. Preparation of Defendants' joint federal income tax returns

Sidney Yoskowitz, Defendants' accountant, prepared and filed their original 2010, 2011, and 2012 federal income tax returns. (Gov't 56.1 ¶ 23.) Defendants worked with Yoskowitz for approximately forty years before his retirement. (*Id.* ¶ 24.) Yoskowitz's routine practice during the years he worked for Defendants was to send what he referred to as a "client organizer" to his clients every year to assist him in preparing their federal income tax returns. (*Id.* ¶ 25.) In the client organizer, Yoskowitz asked his clients, among other questions, if they had any foreign income. (*Id.* ¶ 25.) Defendants never returned the client organizer, but instead provided 1099 forms. (*Id.*)

Defendants did not disclose the existence of the Lloyds Account to Yoskowitz when he prepared their original income tax returns for the tax years 2010, 2011, and 2012. (*Id.* ¶ 27.) Defendants did not provide Yoskowitz with any information about the Lloyds Account because, according to Juan, it was "not income in the United States" and Defendants "didn't feel the obligation that we have to this country with this account." *Id.*

According to the government, after Yoskowitz prepared Defendants' 2010, 2011, and 2012 income tax returns, Defendants signed and returned them to Yoskowitz for filing with the IRS. (*Id.* ¶¶ 28–29.) Defendants contend that they did not review the 2010, 2011, and 2012 joint federal income tax returns for accuracy or sign them after Yoskowitz prepared them. (*Id.* ¶ 29; Defs.' 56.1 ¶ 28–29.) Defendants' joint federal income tax returns for the tax years 2010, 2011, and 2012 failed to disclose the existence of the Lloyds Account. (Gov't 56.1 ¶¶ 31–32; Gov't Exs. O, Docket Entry No. 22-21, P, Docket Entry No. 22-22, and Q, Docket Entry No. 22-23.)

3

On Schedule B of their originally filed joint federal income tax returns for 2010, 2011, and 2012, the "no" box was checked in response to the question of whether Defendants had an interest in or a signature or other authority over a financial account (including bank accounts, securities account, or other financial account) in a foreign country.  (*Id.* ¶ 32; Gov't Exs. O, P, Q.) Defendants failed to timely file an FBAR for the Lloyds Account for each of the tax years 2010, 2011, and 2012.  (*Id.* ¶ 34.)

### iii. Defendants' amended income tax returns and the Offshore Voluntary Disclosure Program

Defendants closed the account at the end of 2013 or early 2014, transferring all of the funds in the account to a J.P. Morgan Chase bank account in the United States.  (*Id.* ¶ 15.) Defendants did not consult with any professional advisor, accountant (including Yoskowitz), or other advisor regarding the U.S. tax implications or reporting requirements for the Lloyds Account until late 2013, when Defendants consulted with an attorney in conjunction with the closing of the Lloyds Account and moving the funds to the United States.  (*Id.* ¶ 35.) Juan testified during his deposition that he did not report the Lloyds Account because he believed that if you were a citizen of another country, and the money was generated in that country, then the United States did not have jurisdiction over the foreign account.  (*Id.* ¶ 36.)  His belief was based on a newspaper article written by an individual named "Robert Malta Grossman," once published in a Nicaraguan newspaper, and on conversations with individuals he identified as "international lawyers."  (*Id.*)

Yoskowitz learned about Defendants' foreign income and the existence of the Lloyds Account in 2014 when Defendants' attorney asked Yoskowitz to prepare amended federal income tax returns for income tax years 2005 to 2014.  (*Id.* ¶ 30.)  The amended income tax

4

returns for 2010, 2011, and 2012 disclosed the existence of, and interest income from, the Lloyds Account. (*Id.* ¶ 39.)

In 2014, Defendants sought to participate in the Department of Treasury's Offshore Voluntary Disclosure Program ("OVDP") for tax years 2005 to 2012. (*Id.* ¶ 40.) On March 4, 2014, as part of OVDP, Defendants submitted Offshore Voluntary Disclosures to the IRS, disclosing the existence of the Lloyds Account from 2005 to 2012. (*Id.* ¶ 42.) Defendants admitted the account had a balance of between $1,000,000 and $2,500,000 from 2005 to 2012 and estimated the income the account made for those years was between $0 and $100,000. (*Id.*) As part of their participation in OVDP, in October of 2014, Defendants filed delinquent FBARs with amended income tax returns for 2010 to 2012. (*Id.* ¶ 43.) Defendants eventually withdrew from OVDP in October of 2016. (*Id.* ¶ 44.)

   **iv. The government's assessment of Defendants' FBAR violation penalties**

Defendants consented to extend the time for the IRS to assess civil penalties under 31 U.S.C. § 5321 for the FBAR violations. (*Id.* ¶ 45.) Upon their withdrawal from OVDP, the IRS examined whether Defendants had willfully violated the requirement to file FBARs for 2010, 2011, and 2012. (*Id.* ¶ 46.) The IRS determined that Defendants willfully failed to timely report on an FBAR their financial interest in the Lloyds Account by the deadline for tax years 2010, 2011, and 2012. (*Id.* ¶ 47.)

In 2010, 2011, and 2012, the Lloyds Account had the following balances as of June 30 of the following year, respectively: $2,113,813, $2,064,258, and $2,101,330. (*Id.* ¶ 49.) Initially, the government determined that for tax years 2010 to 2012 the total willful FBAR penalty pursuant to the statutory maximum under 31 U.S.C. §§ 5321(a)(5)(C) and (D) for Defendants was $3,139,701 each. Using its discretion, the government determined that Defendants qualified

5

for mitigation.  The government decided that appropriate FBAR penalties were $172,022 for 2010, $172,022 for 2011, and $172,021 for 2012 for each Defendant.  These amounts were calculated by multiplying the June 30, 2012 account balance of $2,064,258 by 50%, then multiplying the resulting amount of $1,032,129 by 50% to account for each spouse's one-half ownership in the account, and then spreading the resulting amount of $516,065 evenly across years 2010, 2011, and 2012.  (*Id.* ¶ 50.)

After Defendants submitted a formal protest and the IRS conducted an additional review, the IRS ultimately determined that an additional 20% discount would be appropriate.  (*Id.* ¶ 51.)  Thus, the assessments for FBAR penalties for each Defendant's failure to report the Lloyds Account were as follows: $140,017 for 2010, $140,017 for 2011, and $140,017 for 2012, totaling $420,051 each.  (*Id.*)  On October 9, 2019, Defendants each signed an IRS Form 13449, Agreement to Assessment and Collection of Penalties under 31 U.S.C. §§ 5321(a)(5) and 5321(a)(6), in which they each consented to the immediate assessment and collection of FBAR penalties totaling $420,051.  (*Id.* ¶ 52.)  On or about October 22, 2019, a delegate of the Secretary of the Treasury sent Defendants notice of the assessments of these FBAR penalties and demanded payment.  (*Id.* ¶ 54.)  As of February 21, 2023, the unpaid balance on the FBAR assessments for Defendants for 2010, 2011, and 2012, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, was $518,170.30 each.  (*Id.* ¶¶ 55–56.)

      **b.**    **Procedural background**

The government filed the Complaint on October 7, 2021, alleging that Defendants willfully failed to file an FBAR to timely report their financial interest in a jointly-held foreign financial account for the tax years 2010, 2011, and 2012.  (Compl. ¶¶ 7–9, 16, 32.)  The government seeks statutory penalties and associated penalties and interest from each Defendant.

6

(Compl. at 8.)  On March 4, 2022, Defendants filed an answer to the Complaint.  (Answer, Docket Entry No. 8.)  On May 2, 2023, the government moved for summary judgment.  (Gov't Mot.)

## II. Discussion

### a. Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v. N.Y. State Police*, No. 20-CV-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing

7

*Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

### b. Defendants willfully violated 28 U.S.C. § 5314

The government argues that the evidence supports a conclusion that Defendants willfully failed to file an FBAR[4] because recklessness is sufficient to establish willfulness and the undisputed evidence shows that Defendants acted recklessly.[5]  (Gov't Mem. 1–2, 16–18).  In support, the government argues that the "evidence amassed to date establishes that the Defendants' conduct is consistent with, and exceeds, the indicia of recklessness established in the FBAR case law," because: (1) Defendants submitted federal income tax returns that falsely stated they had no foreign financial accounts during the relevant tax years; (2) they failed to ask their accountant about their responsibilities as to the Lloyds Account; (3) they understood that interest income from a domestic bank is taxable under U.S. law; (4) they instructed the foreign bank to hold mail related to the Lloyds Account and not invest in U.S. securities; (5) the Lloyds Account was a significant percentage of their net worth during the years at issue; and

---

[4] Defendants do not dispute that they improperly failed to timely file FBARs for tax years 2010 to 2012.  (Defs.' Mem. 2.)  The parties dispute only whether Defendants' failure to file FBARs was willful.  (Gov't Mem. 1; Defs.' Mem. 2.)

[5] The government also argues that Defendant's affirmative defenses lack merit.  (Gov't Mem. 20–21.)  Defendants asserted the following affirmative defenses in their Answer: (1) failure to state a claim upon which relief can be granted; (2) a failure to show "willfulness or other requisite state of mind"; (3) "mistake"; (4) that the government's claims are barred by the statue of limitations; (5) "waiver, equitable estoppel, or laches"; (6) "recoupment or set off"; and (7) "any other matter constituting avoidance or affirmative defense."  (Answer 4.)  Because Defendants do not argue that any of these affirmative defenses bar summary judgment in favor of the government, the Court declines to consider them.  *See, e.g.*, *Arbitron Inc. v. Tralyn Broadcasting, Inc.*, 526 F. Supp. 2d 441, 447 (S.D.N.Y. 2007) ("A defendant is required to plead and adequately develop an affirmative defense during pretrial proceedings so that a district court can determine which claims, if any, may be disposed of by summary judgment." (citing *Kerman v. City of New York*, 374 F.3d 93, 111–12 (2d Cir. 2004)).

8

(6) Defendants are sophisticated taxpayers, part-owners in real-estate ventures, and individuals surrounded by professionals who "were in positions to either advise them about the implications of the foreign account, or at the very least point them in [the] right direction." (Gov't Mem. 1–2, 16–18).

Defendants argue that 31 U.S.C. § 5321(a)(5) requires a showing that they intentionally violated the FBAR requirement and that there is a genuine dispute of fact as to whether they did so, because they did not review or sign their tax returns and they believed that they did not have to report the Lloyds Account. (Defs.' Mem. 2–5; Defs.' 56.1 ¶ 32.)

Under 31 U.S.C. § 5314, "a United States person with an interest in foreign financial accounts having an aggregate value of more than $10,000 is required each year to file an FBAR." *United States v. Kahn*, 5 F.4th 167, 169 (2d Cir. 2021) (citing 31 U.S.C. § 5314; 31 C.F.R. § 1010.350(a); 31 C.F.R. § 1010.306(c)). The government may collect civil penalties where an individual "violates, or causes any violation of, any provision of section 5314," 31 U.S.C. § 5321(a)(5)(A), and "[i]n the case of any person willfully violating, or willfully causing any violation of, any provision of section 5314," the government may collect civil penalties up to the greater of (1) $100,000, or (2) 50% of the balance in the unreported foreign account at the time of the violation, *id.* § 5321(a)(5)(C)–(D). *See also Kahn*, 5 F.4th at 170 (noting that "for willful behavior," the maximum civil penalty "for failure to file an FBAR [is] the greater of $100,000 or 50 percent of the aggregate balance in the accounts at the time of the violation." (additional citation omitted) (citing 31 U.S.C. § 5321(a)(5)(C)(i))); *United States v. Mrvic*, 652 F. Supp. 3d 409, 411 (S.D.N.Y. 2023) ("United States citizens must file with the IRS [an FBAR] if they have an interest in a foreign bank or other financial account, and civil penalties attach for failure to abide by the FBAR reporting requirements." (citations omitted)); *Zuhovitzky v. UBS AG CHE*

9

Case 1:21-cv-05578-MKB-PK   Document 25   Filed 01/30/24   Page 10 of 19 PageID #: 920

*101.329.562*, No. 21-CV-11124, 2023 WL 4584452, at *9 (S.D.N.Y. July 18, 2023) ("[I]f a U.S. citizen 'willfully violat[es]' or 'willfully caus[es] a violation,' the penalty [for violating FBAR disclosure requirements] increases to either $100,000 or 50% of the amount in the assets in the unreported account at the time of the violation, whichever is higher." (second and third alterations in original) (quoting 31 U.S.C. § 5321(a)(5)(C)–(D))). "To be found liable for a willful violation under 31 U.S.C. § 5321(a)(5), the United States must prove by a preponderance of the evidence that (1) [Defendants are] United States citizen[s]; (2) [Defendants] had an interest in, or authority over a foreign financial account; (3) the account had a balance exceeding $10,000.00 at some point during the reporting period; and (4) [Defendants] willfully failed to disclose the account and file [FBARs]." *United States v. Schik*, No. 20-CV-2211, 2022 WL 685415, at *4 (S.D.N.Y. Mar. 8, 2022).

Although the Second Circuit has not yet addressed the meaning of "willful" in the context of Section 5321(a)(5), the Supreme Court has stated that "where willfulness is a statutory condition of civil liability," it will generally be construed to include "not only knowing violations of a standard, but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007) (collecting cases). The Second Circuit has also held that, for the purposes of 26 U.S.C. § 6672, which provides penalties for willful failure to collect and pay withholding tax, an "individual's bad purpose or evil motive in failing to collect and pay the taxes 'properly play[s] no part in the civil definition of willfulness.'" *Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997) (alteration in the original) (quoting *Hochstein v. United States*, 900 F.2d 543, 548 (2d Cir. 1990)). Other courts in this Circuit have thus concluded that willfulness for purposes of Section 5321(a)(5) includes both knowing and reckless violations. *See United States v. Katholos*, No. 17-CV-531, 2022 WL 3328223, at *8 (W.D.N.Y. Aug. 10, 2022) ("[W]illfulness includes

10

recklessness."); *Schik*, 2022 WL 685415, at *5 ("The Court agrees with the decisions of almost every court, including those in this Circuit, that have considered the issue and now holds that a 'willful violation' includes reckless violations for purposes of a civil FBAR penalty."); *United States v. Gentges*, 531 F. Supp. 3d 731, 743 (S.D.N.Y. 2021) ("[F]or purposes of the civil penalties provision in [Section] 5321(a)(5)(C)(i), a willful violation of the FBAR reporting requirement includes both knowing and reckless violations of the statute."); *United States v. Bernstein*, 486 F. Supp. 3d 639, 647 (E.D.N.Y. 2020) (noting that in the context of a failure to file an FBAR, "recklessness is a subset of, or an alternative to, willfulness" (citing *Safeco Ins.*, 551 U.S. at 57)).

Other circuit courts have similarly concluded that "willfulness" for the purpose of Section 5321 includes reckless violations. *See, e.g.*, *United States v. Rum*, 995 F.3d 882, 889 (11th Cir. 2021) ("[W]illfulness in [Section] 5321 includes reckless disregard of a known or obvious risk."); *United States v. Horowitz*, 978 F.3d 80, 88 (4th Cir. 2020) ("[F]or the purpose of applying § 5321(a)(5)'s civil penalty, a 'willful violation' of the FBAR reporting requirement includes both knowing and reckless violations[.]"); *Norman v. United States*, 942 F.3d 1111, 1115 (Fed. Cir. 2019) ("[W]illfulness in the context of § 5321(a)(5)(C) includes recklessness."); *Bedrosian v. United States*, 912 F.3d 144, 152 (3d Cir. 2018) ("*Bedrosian I*") (concluding that in the context of failing to file an FBAR, "willfulness" covers "not only knowing violations of a standard, but reckless ones as well" (internal quotation omitted)). Consistent with all the courts that have considered this issue, the Court finds that a showing that Defendants recklessly failed to fail FBARs would result in civil penalties under Section 5321(a)(5)(C).

In the civil context, recklessness "encompasses an objective standard — specifically, 'the civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act

11

in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Gentges*, 531 F. Supp. 3d at 744 (quoting *Horowitz*, 978 F.3d at 89); *Katholos*, 2022 WL 3328223, at *8 (same).  In the context of Section 5321, "willfulness is established if 'the defendant (1) clearly ought to have known that (2) there was a grave risk that an accurate FBAR was not being filed and if (3) he was in a position to find out for certain very easily.'" *Katholos*, 2022 WL 3328223, at *8 (quoting *Horowitz*, 978 F.3d at 89).

Construing the evidence in Defendants' favor, Defendants "entrusted the preparation and filing of their tax returns to their long-time accountant and did not review the tax returns or sign them prior to filing." (Defs.' 56.1 ¶ 32.)[6]  Defendants argue that this demonstrates that their failure to file an FBAR was not willful.  (Defs.' Mem. 3.)  However, "most courts have held that where . . . a defendant provides false information regarding foreign bank accounts by failing to review carefully his income tax return, that defendant has shown reckless disregard toward, and thus has willfully violated, the FBAR reporting obligation."  *Gentges*, 531 F. Supp. 3d at 745–46 (collecting cases) (concluding that the defendant's admission that he filed his income tax return "without any significant substantive review . . . doom[ed] [his] argument on summary judgment"); *see also Kimble v. United States*, 991 F.3d 1238, 1242–43 (Fed. Cir. 2021) (concluding that the grant of summary judgment to the government was not clear error because

---

[6] (*See also* Gov't Ex. C, Dep. of Juan Reyes 165:5–16 (answering, in response to the question of whether Defendants' accountant sent the 2010 tax return to their house for Defendants to review and sign that "I think . . . because we['d] been doing that for 40 years . . . he probably trust[ed] us and we trust[ed] him" and stating that Defendants "[p]robably" reviewed and confirmed the accuracy of the original 2010 return prior to signing it), 176:16–19 (stating that the process for preparing the 2011 tax return was the same as for the 2010 tax return), 188:24–189:16 (same for 2012 tax return), Docket Entry 22-9; Gov't Ex. D, Dep. of Catherine Reyes 30:2–21 (stating that she did not review and confirm the accuracy of the income tax returns for 2010, 2011, or 2012 before faxing them back to Defendants' accountant), 37:89 (stating that if Defendants' accountant "sent it to me I signed it"), Docket Entry 22-10.)

12

the undisputed facts showed a willful violation where, among other things, the defendant did not review her tax returns before signing and filing them, and the tax returns stated that she had no foreign accounts); *Horowitz*, 978 F.3d at 90 (concluding that defendants acted recklessly in part because they "repeatedly failed to review the[ir] returns with the care sufficient at least to discover their misrepresentation of foreign bank accounts, while nonetheless stating that the returns were accurate" and that "such recklessness was only heightened by the fact that they understood that the tax returns represented only the information that they had provided to the[ir] accountant").[7] Defendants' failure to meaningfully review their tax returns before filing returns that inaccurately represented that they had no foreign accounts thus shows that they "recklessly disregarded the FBAR reporting obligation." *Gentges*, 531 F. Supp. 3d at 750.

In addition, the undisputed facts show other indicia of recklessness. First, Defendants never asked their "long-time accountant" to whom they "entrusted the preparation and filing of their tax returns" whether they were required to report their foreign account, nor did they inform him that the foreign account existed, despite his attempt to collect that information via his "client

---

[7] The lack of a physical signature on Defendants' tax returns for the years in question does not establish a genuine dispute of material fact. Defendants point to the fact that they did not physically sign the tax returns to support their argument that they did not review the tax returns before filing, not as evidence that they did not provide authorization for their accountant to file the returns. (*See* Defs.' Mem. 3 (identifying the "core fact at issue" as "[D]efendants' state of mind as to the requirement that they disclose a foreign bank account" and objecting to the government's "reliance upon [Defendants'] unsigned income tax returns as verified fact to establish their state of mind").) Defendants do not dispute that they authorized the filing of their tax returns.

Regardless, courts have held that an electronic signature in the form of a Personal Identification Number ("PIN") such as the one on Defendants' tax returns may suffice to serve as a taxpayer's signature. *See, e.g.*, *United States v. Lawrence*, 557 F. App'x 520, 530 (6th Cir. 2014) (concluding that because, among other things, the defendant did "not dispute that his PIN [was] on th[e] [tax] returns or that he authorized [his accountant] to e-file his returns," his PIN provided a sufficient basis for a jury to conclude that he had "subscribed" his name to the tax returns for purposes of his violation of 26 U.S.C. § 7206(1)).

13

organizer" questionnaires. (Defs.' 56.1 ¶ 32; Gov't 56.1 ¶¶ 24–25, 27, 35); *see, e.g.*, *Gentges*, 531 F. Supp. 3d at 750–51 (noting that "courts have repeatedly held" that where a defendant does not disclose the existence of his foreign accounts or seek advice from his tax preparer regarding the accounts, "such an omission constitutes evidence of recklessness or willful blindness toward the FBAR reporting obligation"); *Horowitz*, 978 F.3d at 90 (affirming the grant of summary judgment in favor of the government where, among other things, the defendants failed to ask their accountant about their reporting requirements for their foreign account); *Kimble*, 991 F.3d at 1242–43 (concluding that the grant of summary judgment to the government was not clear error because the undisputed facts showed a willful violation where, among other things, the defendant "knew about the numbered account and took efforts to keep it secret by . . . not disclosing the account to her accountant"). Defendants point to the fact that they relied on a news article in a Nicaraguan newspaper and informal conversations with "international lawyers" outside of the United States for their understanding that they did not have to report their foreign account, but "a defendant's subjective belief does not negate a finding of recklessness or willful blindness, particularly where, as here, a defendant could easily have determined whether his belief was accurate by speaking with a longtime tax preparer." *Gentges*, 531 F. Supp. 3d at 750; *see also Horowitz*, 978 F.3d at 89 ("[The defendants'] only explanation for not disclosing foreign interest income related to some unspecified conversations they had with friends in Saudi Arabia in the late 1980s. Yet, if the question of whether they had to pay taxes on foreign interest income was significant enough to discuss with their friends, they were reckless in failing to discuss the same question with their accountant at any point over the next 20 years.").

Second, although Defendants assert that they "do not recall ever having requested that Lloyds Bank keep mail related to their account," it is undisputed that they paid a fee to the

14

Lloyds Account for a "keep mail" service, under which the bank retained all account-related correspondence, rather than sending it to Defendants at their designated address in the United States.  (Defs.' 56.1 ¶ 14; Gov't 56.1 ¶ 14.)  Defendants also do not dispute that they signed documents directing the bank to sell all of their U.S. securities and not invest in further U.S. securities.[8]  (Gov't 56.1 ¶ 17; Defs.' 56.1 ¶ 17; Gov't Ex. K); *see also Gentges*, 531 F. Supp. 3d at 751 ("Also significant is the fact that both of [d]efendant's foreign accounts were set up as numbered accounts with 'hold mail' service."); *Horowitz*, 978 F.3d at 90 (noting the defendants' use of the "hold mail" service for their foreign account); *Bedrosian v. United States*, 42 F.4th 174, 180 (3d Cir. 2022) ("*Bedrosian II*") (noting that the defendant's foreign accounts were subject to a "mail hold" and that the undisputed facts of "the existence of the mail hold or that he signed a form and paid a fee to the bank for this benefit" were relevant to the question of whether he had willfully violated the FBAR reporting requirement); *Norman*, 942 F.3d at 1116 (concluding that, among other things, the defendant's signing of a "document preventing [her bank] from investing in U.S. securities on her behalf" was a step that "had the effect of inhibiting disclosure of the account to the IRS").

Finally, it is also undisputed that the balance of the Lloyds Account represented between 75% and 90% of Defendants' wealth during the years in question.  (Gov't 56.1 ¶ 16; Defs.' 56.1 ¶ 16); *see Gentges*, 531 F. Supp. 3d at 752 (noting that the size of the accounts in question "were by no means small or insignificant and thus susceptible to being overlooked by" the defendant (quoting *Horowitz*, 978 F.3d at 90)); *Bedrosian II*, 42 F.4th at 180 (noting that the defendant had

---

[8] Defendants dispute only their intent in signing the form, asserting that the form "does not explicitly state that [Defendants] requested this for the purpose of avoiding U.S. income tax withholdings."  (Defs.' 56.1 ¶ 17.)

15

"also acknowledged that he was aware of the significant amount of money held in his foreign bank accounts").

Defendants' undisputed failure to review their incorrect tax returns in advance of the filing of the returns, as well as the additional undisputed evidence, demonstrate that they acted, at a minimum, recklessly when they failed to file FBARs in 2010, 2011 and 2012, and they are therefore subject to enhanced penalties for a willful violation under 31 U.S.C. § 5321(a)(5)(C). Accordingly, the Court grants the government's motion for summary judgment.

  c. **Penalty**

Under 31 U.S.C. § 5321(a)(5)(C)(i), as a result of a willful violation of the FBAR filing requirement, a defendant can be subject to a maximum civil penalty of "the greater of $100,000, or 50 percent of" the balance of the account at the time of the violation. *See Kahn*, 5 F.4th at 170 (noting that "for willful behavior," the maximum civil penalty "for failure to file an FBAR [is] the greater of $100,000 or 50% of the aggregate balance in the accounts at the time of the violation." (citing 31 U.S.C. § 5321(a)(5)(C)(i))). The Internal Revenue Manual ("Manual") states that the "violation date" for FBAR violations in calendar years 2015 and earlier occurs on "June 30th of the year following the calendar year for which accounts must be reported." Manual § 4.26.16.5.2(2); *see also Gentges*, 531 F. Supp. 3d at 752 ("Under the Internal Revenue Manual, '[t]he date of a violation for failure to timely file an FBAR is the end of the day on June 30th of the year following the calendar year for which the accounts are being reported[,]' and thus, '[t]he balance in the account at the close of June 30th is the amount to use in calculating the filing violation.'" (alterations in original) (quoting Manual § 4.26.16.6.5)).

The government asserts, and Defendants do not dispute, that each Defendant is subject to a penalty of $420,051,[9] and that the unpaid balance for each Defendant as of February 21, 2023, including failure to pay penalties, interest, and other statutory accruals under 31 U.S.C. § 3717, is $518,170.30.[10]  (Gov't 56.1 ¶¶ 55–56; Defs.' 56.1 ¶¶ 45–46; Cox Decl. ¶¶ 4–5.)  Because Defendants do not challenge the government's assessment, and there is nothing in the record to suggest that the government failed to calculate the penalties in line with its own internal guidelines, or inappropriately exercised its discretion in reducing the maximum penalties, there is no basis to conclude that the penalties are arbitrary or capricious.  The Court therefore grants the government's summary judgment motion as to the penalties assessed against each Defendant.

---

[9] Defendants do not dispute that on the violation date for the 2010 FBAR reporting violations, the Lloyds Account had a balance of $2,113,813; for the 2011 FBAR reporting violations, the Lloyds Account had a balance of $2,064,258; and for the 2012 FBAR reporting violation, the Lloyds Account had a balance of $2,101,330.  (Gov't 56.1 ¶ 49; Defs.' 56.1 ¶ 48–56.)  Multiplying each of these amounts by 50%, the maximum penalty is $1,056,907 for the 2010 violation; $1,032,129 for the 2011 violation; and $1,050,665 for the 2012 violation.  (Gov't Ex. DD 17, Docket Entry No. 22-36; Gov't Ex. EE 17, Docket Entry No. 22-37.)  As a result, the government determined that the maximum penalty under § 5321(a)(5)(C)(i) was $3,139,701 for each Defendant.  (Gov't. 56.1 ¶ 50.)
   The government, in its discretion, determined that the maximum penalty was "too severe," and instead determined that for each Defendant the appropriate penalty would be $175,022 for the 2010 violation; $175,022 for the 2011 violation; and $175,021 for the 2012 violation.  (Gov't Ex. DD 6; Gov't Ex. EE 6.)  These amounts were reached by taking 50% of the account balance as of June 30, 2012, the violation date for the 2011 violation, and then further reducing that balance by 50% to represent each Defendant's 50% ownership of the account, resulting in a total penalty of $516,065, which the government then spread evenly over the 2010 through 2012 tax years.  (Gov't Ex. DD 6; Gov't Ex. EE 6; Gov't 56.1 ¶ 50.)  The government then reduced the penalties by an additional 20% each after Defendants submitted a formal protest, resulting in final penalties for each Defendant's willful FBAR reporting violation of $140,017 for 2010; $140,017 for 2011; and $140,017 for 2012.  (Gov't 56.1 ¶ 51; Gov't Ex. FF, Docket Entry No. 22-38; Gov't Ex. GG, Docket Entry No. 22-39.)  The total penalty for each Defendant was therefore calculated to be $420,051.  (Cox Decl. ¶¶ 4–5, Docket Entry No. 22-3.)

[10] The government asserts that each balance of $518,170.30 includes $420,051 due from the FBAR penalty, $14,017.04 due in interest, and $84,102.26 due as a late-payment penalty under 31 U.S.C. § 3717(e)(2).  (Cox Decl. ¶¶ 4–5.)

*See Gentges*, 531 F. Supp. 3d at 752 (noting that IRS penalty calculations are reviewed "for abuse of discretion under the 'arbitrary and capricious' standard of the Administrative Procedure Act," and granting summary judgment with respect to the penalty calculation for a bank account for which the defendant did not dispute the penalty calculation); *Rum*, 995 F.3d at 895 (concluding that because the IRS's actions in determining the defendant's FBAR penalty were not improper, they were not arbitrary and capricious).

### III. Conclusion

For the reasons stated above, the Court grants the government's motion for summary judgment.

Dated: January 10, 2024
　　　 Brooklyn, New York

　　　　　　　　　　　　　　　　　　　　SO ORDERED:


　　　　　　　　　　　　　　　　　　　　_____s/ MKB_____
　　　　　　　　　　　　　　　　　　　　MARGO K. BRODIE
　　　　　　　　　　　　　　　　　　　　United States District Judge