# MAZZOLA LINDSTROM LLP

RICHARD E. LERNER
PARTNER
Richard@mazzolalindstrom.com
O: 646-813-4345
C: 917-584-4864

May 10, 2024

**Via ECF**

Honorable Margo K. Brodie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

**Re: United States v. Reyes, 21-cv-05578 (MKB)**

Dear Chief Judge Brodie:

I represent the Reyes defendants. On May 3rd, the court conducted a telephone conference to discuss the issues raised in the letter briefs regarding and, at the conclusion, directed the undersigned to provide authority, if available, for the proposition that the court has discretion to impose a lesser penalty than 6% on top of the FBAR penalty of 50% of the value of the account as to which an FBAR penalty is imposed. I remind the court that after payment of taxes owed, and penalties already paid, and further FBAR penalties and prejudgment interest and an additional 6% penalty, the Reyeses would be left with about 30% of the money from the Nicaraguan funds. This would be a devastating hit for the Reyeses, and a manifest injustice. As discussed below, the Reyeses should not be punished as though they are hardened criminals or otherwise evil-doers. Imposing the full measure of penalties that the United States seeks is, the Reyeses submit, violative of their Eighth Amendment rights. Dr. Reyes, at age 91, is still working, at little to no pay, serving downtrodden communities that simply cannot pay for medical care. He has not built up a nest-egg by caring for the rich since immigrating to America. Rather, he had relied on the money that was left to him by his parents, what was left after the Communists stole the rest of their assets and killed family members. Even though the United States has now been made whole by the payment of the taxes owed on the money (as has the State of New York), the United States is seeking not just an additional pound of flesh, but to sap the Reyeses of their lifeblood. It is plainly wrong.

In *United States v. Hughes*, 2023 U.S. Dist. LEXIS 36975 (N.D. Cal., March 6, 2023), the court noted that after a bench trial and a finding of a willful violation (under a recklessness standard) of the FBAR reporting requirements, the court had remanded the matter for recalculation of penalties, also instructing the United States to consider whether mitigation was warranted under the circumstances. The case returned to after remand, and the Hughes court noted that, "Based on guidance in the [Internal Revenue Manual], the IRS determined that Hughes is eligible for mitigation because the following conditions are satisfied: (1) Hughes has no history of relevant criminal convictions or previous FBAR penalty assessments; (2) no money

passing through the relevant accounts 'was from an illegal source or used to further a criminal purpose'; (3) Hughes cooperated during the IRS's investigation; and (4) no penalty was assessed against Hughes for fraudulently underreporting her taxes related to foreign accounts for the years at issue." The Reyes defendants respectfully submit that such a remand should be directed here, as they obviously do not have a history of criminal activity, the money that was in the foreign bank was deposited there by Dr. Juan Reyes's parents in order to keep it from being stolen by the Communists that had taken control over Nicaragua, the Reyeses have fully cooperated, and there was manifestly no fraud.

As should this court, the *Hughes* court declined to impose a 6% penalty on top of the FBAR penalty, stating, "the United States has offered no evidence of the applicable Treasury rates for the purpose of assessing interest under § 3717(a)(1), nor of any action by the Secretary of the Treasury any other 'head of an executive . . . agency' to set late payment penalties at the maximum six percent rate (or at any lower rate) permitted by § 3717(e)(2). The United States therefore has not satisfied its burden of proof to show that the one percent interest rate *and six percent penalty rate it seeks to apply are valid*." (Emphasis added). Here, the Reyeses respectfully ask that this court reach the same conclusion, as evidence has not been presented, such as an affidavit from any executive of Treasury as to the amount imposed.

More fundamentally, however, the Reyeses now respectfully submit that, as did the *Hughes* court, this court should remand this matter, with a directive that the United States consider whether mitigation is warranted in light of the factors noted above – viz., that the Reyeses were not engaged in any kind of criminal enterprise; they were not laundering money or hiding moneys of criminals; they did not commit fraud. There was no criminal mens rea.

These issues were addressed closer to home, in the U.S. District Court for the District of Connecticut, in the case of *United States v. Garrity*, 2019 U.S. Dist. LEXIS 32404 (D. Conn., Feb. 28, 2019), wherein the court noted that it had conducted a six-day jury trial – that is, the case was not decided merely on summary judgment papers – and it was found that the maximum penalty was warranted, even in the face of an Eighth Amendment challenge. But the facts warranting such maximum penalty show, by contrast with the case at bar, that the penalties imposed herein would indeed be confiscatory and violative of the Eighth Amendment. The *Garrity* court stated:

> Courts assessing the proportionality of a fine under the Eighth Amendment are guided by four factors "distilled" from the Supreme Court's analysis in *United States v. Bajakajian*, 524 U.S. 321, 118 S. Ct. 2028, 141 L. Ed. 2d 314 (1998):
>
> > [1] the essence of the crime of the defendant and its relation to other criminal activity, [2] whether the defendant fit[s] into the class of persons for [*20] whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the defendant's conduct.
>
> *United States v. Castello*, 611 F.3d 116, 120 (2d Cir. 2010).
>
> ***
>
> The [Garrity] Defendants have … offered no explanation for why Mr. Garrity opened the foreign account, nor have they identified the source of the money in it. Further, although the Government was not required to prove that Mr. Garrity engaged in other illicit

activity related to his foreign account, there was evidence at the trial that, at the very least, raises serious questions about his and his sons' activity related to the account. For example, the account was opened in Liechtenstein under the name of a trust known as a Liechtenstein Stiftung. In 2008, Liechtenstein was one of three countries identified as tax havens by the Organization [*21] for Economic Development and Cooperation. (Citation omitted). The Joint Committee on Taxation reported that U.S. citizens frequently utilized trust accounts in Liechtenstein to shield their assets from discovery by authorities and evade taxes. (Citation omitted).

There was also evidence that Mr. Garrity and his sons made efforts to keep the account's existence a secret. Two of his three sons who testified at trial invoked their Fifth Amendment rights as to all questions about the account, including questions about a trip to Liechtenstein to make large cash withdrawals from the account. The third son testified that, upon flying home from that trip, he gave his cash to his brothers out of concern for U.S. currency transaction reporting requirements, only to recover the cash once they cleared customs. (See ECF No. 196-1 at 2-5.) While the jury was not required to make any findings about the suspicious efforts to maintain the secrecy of the account, the Defendants have not borne their [*22] burden of showing that the violation had nothing to do with criminal activity. Contrast *Bajakajian*, 524 U.S. at 337-38 ("[Bajakajian's] violation was unrelated to any other illegal activities. The money was the proceeds of legal activity and was to be used to repay a lawful debt."). … Mr. Garrity never disclosed the account, and the absence of criminal charges arising from his violation may owe largely to his success in concealing it during his lifetime. That success also likely weakened the Government's ability to investigate and uncover potentially unlawful activity related to the account. All of this suggests that Mr. Garrity's conduct in this case went to the core purpose of the FBAR filing requirement under the BSA. See *California Bankers Ass'n*, 416 U.S. at 76 ("[T]he recordkeeping and reporting requirements of the Bank Secrecy Act are focused [*23] in large part on the acquisition of information to assist in the enforcement of criminal laws.").

This case is thus unlike *Bajakajian*, where, after a bench trial, **the district court expressly "found that the funds were not connected to any other crime** and that respondent was transporting the money to repay a lawful debt." *Id.* There was no similar finding in this case about the source of the money in Mr. Garrity's account or its intended purpose, and, as suggested above, the evidence would not have supported such a finding.

In the case at bar, the Reyeses' money was not connected to any crime whatsoever. They were not engaged in fraudulent tax evasion, as they did not believe that money entrusted to Dr. Reyes, and then titled over to Dr. Reyes and his wife Catherine, was subject to U.S. taxes. The money was transferred out of Nicaragua simply so that the Communists wouldn't seize it, never expecting, of course, that the United States would. As the *Garrity* court noted, "[t]he purpose of the [Bank Secrecy Act] is 'to require certain reports or records where they have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings . . . .'" 31 U.S.C.A. § 5311. The FBAR penalty targets individuals who fail to disclose their interest in foreign accounts, preventing the Government from identifying and investigating possible tax evasion or criminal activity. As explained above, Mr. Garrity fits squarely into the class of persons for whom the BSA was designed." In contrast, the Reyeses fit squarely outside the class of persons for whom the BSA was designed. They had no criminal intent.

MAZZOLA LINDSTROM LLP

      The Reyeses respectfully request that this court remand the matter to the United States so that it can consider mitigation, in light of the above. Failing that, the Reyeses note their objection to the imposition of such confiscatory penalties, as violative of their Eighth Amendment rights, and submit that, for the same reasons that the District of California declined to impose an additional 6% penalty on top of other penalties, this court do likewise.

      Respectfully submitted,

MAZZOLA LINDSTROM LLP

Richard E. Lerner

**Service via ECF**

MAZZOLA LINDSTROM LLP